ORIGINAL

STEVEN A. ELLIS (SBN 171742)
sellis@goodwinprocter.com
ALISON M. NORRIS (SBN 248711)
anorris@goodwinprocter.com
SHANNA M. RAMSOWER (SBN 272430)
sramsower@goodwinprocter.com
**GOODWIN PROCTER LLP**
601 S. Figueroa St., 41st Floor
Los Angeles, California 90017
Tel.: 213.426.2500
Fax: 213.623.1673

Attorneys for Defendants:
*EverHome Mortgage Company*, sued in that
name and as Alliance Mortgage Company
dba BNY Mortgage

FILED
2011 APR 20 PM 3:46
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY ___

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

NATIONAL ORGANIZATION OF
ASSISTANCE FOR HOMEOWNERS a
Non-Profit Homeowner Organization
representing Individual Members;
JAIME ACIO; FRED AGUILAR;
DIVINA ARAGON; ARACELI
ARREOLA; BRUCE BANH; ROGER
BARROW; PATRICIA
CAMPOVERDE; PAULINE CANAS;
RUSTICO CORPUZ; ANTONIO
CUELLAR; TRAN DAO; THOMAS
DIEP; DARIO DRAKE; ARNOLD
DYSICO; LYDIA EDEJER; DELFIN
FAVORITO; JAIME GUINTO;
CARMEN GUTIERREZ; BEATRICE
HERNANDEZ; TRACY HO; SUSAN
HOANG; DE HUYNH; FELIPE R
LOPEZ; MARIO LOPEZ; CHRISS
NGUYEN; NORA ORTEZA; ROSITA
QUIJADA; LYNN RAMOS;
MILAGROS REOTUTAR; MOISES
RODRIGUEZ; CESAR SOLLA;
HUMBERTO TORRES ARREOLA;
KHEO TRAN; MARIA TRUJILLO;
RAFAEL VASQUEZ; ANA CALMA;
FRANCISCO UBANA; JUAN
BALTAZAR; TOMMY ENCINAS;
SALVADOR SASING; BRUCE
BANH; BOBBY CABESAS;
EDUARDO FERRER; MARIA

Case No. SACV11-00622   JST (VBKx)

**NOTICE OF REMOVAL**

**Removed from Orange County
Superior Court, Case No. 30-2011-
00447677-CU-OR-CXC**

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

PAID

LIBW/1779028.3

Goodwin Procter LLP
601 S Figueroa St, 41st Floor
Los Angeles, California 90017

1 CORTEZ; ALAOLU AKANDE;
EFREN AND VICTORIA RAMIN;
2 EMERITA C. ROSS; KHLOEUNG
YOU; JOSE CRUZ; RACHEL
3 LICUANAN; ALBERT SANFORD;
JESUS OROZCO; MICHAEL
4 MCCARTHY; MODESTO JAOJOCO;
GEORGE ROXAS; EDEN HERRERA;
5 JAY McREYNOLDS; RAMON
QUIZON; BULMARO
6 MALDONADO; RODITHA
CAMACHO; IGRID AGRA; MARIA
7 LOURDES CEBREROS; LOTA
BAUTISTA; EVANGELINE
8 BRIGHAM; ARTHUR LINDSEY;
FELICIDAD DIAZ; MARIANO
9 PINEDA; RODOLFO CAIREL;
PLINYLOU FONDEVILLA;
10 MARIANO TADEO; MANUEL
HERNANDEZ; JOSE MENDEZ;
11 MARIA GARCIA; CARLITO BUGAS.
KATHRYN COWAN; MIRIAM
12 ZUNIGA; PATRICIA DOMINICUS;
ISABEL FERNANDEZ; GLORIA
13 ENRIQUEZ; JOSELITO FABIONAR
;WILFREDO FUNTANILLA;
14 ROSELLYN ROQUE; VIRGINIA
SEBASTIAN; SENEN OCHOA;
15 DANNY GARO; ALLISON GORE;
CECILIO GONZALEZ; MANOLO
16 GONZALES ;JEANNIE HA; TIN
NGUYEN; ROEL VILLANUEVA;
17 NICOLAS GARCIA; NANSHI
IGNACIO; AUGUSTO PAGTAKHAN;
18 RENATO VIRAY; ALICIA
CORNEJO; PABLO KISLANKA;
19 SUZANNE LOBATO; ZENY MAE
HARRINGTON; HIEU NGUYEN;
20 XIONGH THAO; BOUA THAO;
MICHAEL PHAN; IRINEO PADILLA;
21 MANUEL VILLANEDA;
CASSANDRA ANDRES;
22 GUADALUPE GALVEZ; CELESTE
RODGERS; JUDY BARTOLOME;
23 ALLEN RICHARDSON; RAMON
IILAN; CICERO VILLACORTA;
24 MARIA ESQUIVIAS; JENNIFER
FABIA; ROBERTO de ALBA;
25 MARTHA VARGAS; VIRGILIO
VILANO; JOSE BALLESTEROS;
26 MERLITA LAVARIAS; VIOLETA
MARTINEZ; RICARDO ALATORRE;
27 DAN HANG; ASCENCION
CARRILLO; ANTONIO FLORES;
28 ANGEL MEDINA; COCKY BULL;

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

1  VIRGINIA PANTALEON; JUAN
   MANUEL NUNEZ; ARACELI
2  ABELEDA; THOMAS VUONG;
   SALVADOR TELLO; AUGUSTIN
3  LUGUE; BENJAMIN CAPA; PAZ
   VERANO; SEUNG HEE UM; MARIA
4  LOURDES MAGLUPAY; OSARO
   IKHYWUREFE; MARGARET NIBA;
5  DIEP PHAM; ANHTHU PHAM; TRI
   MINH PHAM; NELSON AVILA;
6  LOUELLA D. MANZANO; VICENTE
   M. VENTINILLA; NORIEL P.
7  ADRICULA; FRANK M. CARDENAS
   III; KATHIE L. CALLAHAN;
8  MICHAEL J. DELVAUX; JENNIE
   DO; VI THI THONG LUU;
9  CHRISTOPHER MORRIS; THUY
   THANH NGUYEN; NINA & CHIEU
10 VAN NGUYEN; JOSE R. RAMIREZ;
   YEN K. HUYNH; SEE JUN KIM; KI
11 W. JANG; BALDOMERO A.
   FERRANCOL; TUAN DUC NGUYEN;
12 WILLIAM THOMAS; MARIVIC
   DUENAS; DEISSY GONZALEZ;
13 JOHNNY ABONALES; JAVIER
   AQUILINO; NORMAN DELA CRUZ;
14 RAFAEL FIGUEROA; WILLIAM
   GUILLEN; JEFFREY SISON; FRANK
15 MACIAS; ENRIQUE C. PEREZ;
   SIMEON REYES JR.; TRAN TRAN;
16 TESSIE RODRIGUEZ; JOSEPHINE
   CASTANAR; DAVID EMMANUEL;
17 MARK SMITH; NAM BINH
   NGUYEN; CHAO WIN TING;
18 ERNESTO GO; ZOILA SANCHEZ;
   ANTHONY MABUTOL; ELEANOR
19 LICUP; ARTHUR QUREISHI; ANA
   ZAVALA; MARY JEAN PISCO;
20 ANTONIO ALVE; SANG WOO SEOL;
   DULCE ALVAREZ; ANNABENA
21 SANTOS; PATRICIO SULIT;
   MARTIN ABOY; DANIEL SIEU;
22 JERROLD LLOPIS; NANCY HYSON;
   BRYAN BA; individuals; on behalf of
23 themselves and all others similarly
   situated; ROES 143 through 5000;
24 inclusive,

25              Plaintiffs,

        v.
26
   AMERICA'S SERVICING
27 COMPANY, an Iowa corporation;
   AMERICAN HOME MORTGAGE
28 SERVICING, INC., a Delaware

corporation; SELECT PORTFOLIO
SERVICING, a Utah corporation; ING
DIRECT, a Delaware corporation;
BANK UNITED, FSB, a corporation;
OPTION ONE MORTGAGE, a
corporation; PEOPLE's CHOICE
HOME LOAN INC; a corporation;
BENEFICIAL CALIFORNIA INC, a
corporation; HSBC MORTGAGE
CORPORATION; GATEWAY BANK;
PHH MORTGAGE; CENLAR LOAN
ADMINISTRATION; BAYVIEW
LOAN SERVICES; FIRST FEDERAL
BANK of CA; FIRST FRANKLIN
LOAN SERVICES; SOVEREIGN
BANK; MIDWEST LOAN SERVICES;
UNION BANK; BANCO POPULAR;
N.A.; PROVIDENT FUNDING
ASSOCIATES; EVERHOME
MORTGAGE COMPANY; AEGIS
WHOLESALE CORP.; WILSHIRE
CREDIT UNION; TMST HOME
LOANS, INC; NATIONSTAR
MORTGAGE, LLC; MOR EQUITY;
FREEDOM MORTGAGE
CORPORATION; CARRINGTON
MORTGAGE SERVICE; LONG
BEACH MORTGAGE CO.;
SUNTRUST MORTGAGE INC.; PNC
FINANCIAL SERVICES; CATHAY
BANK; HOMECOMINGS
FINANCIAL, LLC; QUANTUM
SERVICING CORP.; SPECIALIZED
LOAN SERVICING, LLC; RCS;
VERICREST FINANCIAL, INC;
RESMAE MORTGAGE CORP; CMS;
DESERT COMMUNITY BANK;
CALDIRECT HOME LOAN;
GREENPOINT MORTGAGE
FUNDING, INC; METLIFE HOME
LOANS; MIRAD FINANCIAL
GROUP; VANDERBILT
MORTAGAGE; CAPITALONE
MORTGAGE; FIRST FEDERAL
BANK; GE MONEY BANK;
UNIVERSAL AMERICAN
MORTGAGE COMPANY OF CA;
BRENWARD MORTGAGE;
BAYROCK MORTGAGE
CORPORATION; FLAGSTAR BANK;
ASTORIA FINANCIAL, LLC;
MATRIX FUNDING GROUP, LLC;
TAYLOR BEAN & WHITAKER
MORTGAGE CORP.; ACCREDITED
HOME LENDERS, INC.; FIRST

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

NATIONAL BANK; FIRST
NATIONAL BANK OF ARIZONA;
NATIONAL CITY MORTGAGE;
AMARILLO NATIONAL BANK;
CENTER BANK; SECURED
FUNDING CORP.; NEW CENTURY
MORTGAGE; ALLIANCE
MORTGAGE COMPANY dba BNY
MORTGAGE; AMERICAN
MORTGAGE EXPRESS CORP.;
SIERRA PACIFIC MORTGAGE, INC;
MIDLAND MORTGAGE CO.;
REPUBLIC MORTGAGE; CHEVY
CHASE BANK; UNITED
COMMERCIAL BANK; HANMI
BANK RESIDENTIAL MORTGAGE;
MARIX SERVICING; FIRST
FRANKLIN FINANCIAL; NGBI, INC;
ARGENT MORTGAGE; MIT
LENDING; RBMG, INC. and Does 1 to
1000, inclusive,

Defendants.

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

1  Defendant EverHome Mortgage Company, which has been sued in that name

2  and as Alliance Mortgage Company dba BNY Mortgage, ("Defendant" or

3  "EverHome") hereby removes the above-captioned case, Case No. 30-2011-

4  00447677-CU-OR-CXC, currently pending in the Superior Court of California,

5  County of Orange (the "State Court Action"), to the United States District Court for

6  the Central District of California, Southern Division. As grounds for removal,

7  Defendant states as follows:

8  **I.    BACKGROUND**

9  1.    The Plaintiffs in this action include the National Organization of

10  Assistance for Homeowners ("NOAH") and 206 individual plaintiffs ("Individual

11  Plaintiffs") (collectively, "Plaintiffs"). *See* First Amended Complaint ("FAC"), at

12  pp. 1-3 (caption) & ¶¶ 5-211.[1] According to the FAC, Individual Plaintiffs are

13  borrowers who have sued Defendants after defaulting on their loan obligations, and

14  NOAH is an organization purporting to be a nonprofit corporation operating for

15  educational and charitable purposes. *Id.* The loans of Individual Plaintiffs are

16  secured by real property pursuant to deeds of trust. *Id.*

17  2.    The initial complaint ("Complaint") in this case was filed by many of

18  the same Plaintiffs in the current State Court Action in the Superior Court of the

19  State of California, County of Orange, Case No. 30-2011-00447677-CU-OR-CXC,

20  on or about February 7, 2011. The Complaint is attached hereto as **Exhibit 1**.

21  Plaintiffs then filed their FAC on or about March 11, 2011. The FAC is attached

22  hereto as **Exhibit 2**. All of the pleadings and papers filed in the State Court Action

23  are attached hereto as **Exhibit 3**.

24  3.    The FAC purports to assert causes of action for fraudulent concealment

25  (First Cause of Action), intentional misrepresentation (Second Cause of Action),

26  negligent misrepresentation (Third Cause of Action), violation of California Civil

---

27  [1]  The FAC includes ROE plaintiffs, 120-5000, but unnamed parties are ignored

28  for removal purposes.

1   Code section 2923.5 (Fourth Cause of Action), violation of California's Unfair

2   Competition Law ("UCL"), Business & Professions Code §§ 17200, *et seq* (Fifth

3   Cause of Action), and breach of contract (Sixth Cause of Action). *Id.*, p. 1.

4   Plaintiffs seek relief in the form of damages, declaratory judgment that Plaintiffs'

5   notes and mortgages are void, injunctive relief, "statutory relief" and restitution

6   pursuant to Civil Code section 2923.5, attorney's fees, costs, and pre- and post-

7   judgment interest.  FAC, at p. 94 (Prayer for Relief).

8        4.     As Defendant demonstrates below, this Court has subject matter

9   jurisdiction over this action under 28 U.S.C. section 1332, as amended by the Class

10   Action Fairness Act ("CAFA").

11   **II.**    **THIS COURT HAS SUBJECT MATTER JURISDICTION UNDER CAFA**

12        5.     Under 28 U.S.C. section 1332(d)(11), as implemented by CAFA, a

13   "mass action" is removable as a "class action" to the appropriate United States

14   District Court when (1) the litigation involves monetary claims brought by 100 or

15   more persons proposed to be tried jointly; (2) such claims involve common

16   questions of law or fact; (3) all other requirements of 28 U.S.C. section 1332(d)(2)-

17   (10) are met, including the requirement that the aggregate amount in controversy

18   exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (4) at

19   least one of the plaintiffs' claims exceeds the $75,000 jurisdictional threshold for

20   federal diversity jurisdiction under section 1332(a).  28 U.S.C. §§ 1332(d)(11)(A),

21   (B); *Abrego Abrego v. Dow Chemical Co.*, 443 F.3d 676, 689 (9th Cir. 2006);

22   *Tanoh v. Dow Chem. Co.*, 561 F.3d 945, 952 n.4 (9th Cir. 2009 ).  This case is a

23   removable "mass action" under the provisions of CAFA.

24              Monetary Claims Brought by 100 or More Persons.

25        6.     The FAC alleges that 207 Plaintiffs are entitled to recover monetary

26   damages (and other relief) for the time period of 2002 to 2007.  *See* FAC ¶¶ 6-211,

27   & p. 94 (prayer for relief).  It also demands a jury trial on their collective behalf.

28   *Id.*, p. 2.  Thus, the FAC is brought by more than 100 plaintiffs seeking monetary

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

1   damages and who propose to try the case jointly. *See Bullard v. Burlington No.*

2   *Santa Fe Rwy. Co.*, 535 F.3d 759, 762 (7th Cir. 2008) (affirming the district court's

3   conclusion that "one complaint implicitly proposes one trial").

<u>Common Questions of Law or Fact.</u>

5   7.   Although Defendant does not concede that such common questions

6   exist, the FAC explicitly claims to arise from a set of "common facts" (FAC ¶ 239),

7   including that (i) all of the Defendants allegedly deceived Plaintiffs to enter into

8   loans they acquired or now service; (ii) the Defendants purportedly engaged in the

9   "fraudulent and illegal" use of MERS in connection with those loans; (iii) the

10   Defendants purportedly failed to perform their obligations in connection with certain

11   contracts with third parties; (iv) the Defendants purportedly breached the Plaintiffs'

12   statutory rights, consumer and homeowner protection statutes, the UCL, and other

13   statutes, and (v) the Defendants allegedly accepted money, transferred assets, and

14   foreclosed upon assets in instances when they had no authority to act. *See* FAC ¶¶

15   1, 241-251, 255, 257, 268, 275-278, 288-292.

<u>Requirements of 28 U.S.C. section 1332(d)(2)-(10).</u>

17   8. <u>Minimal Diversity.</u>  The requisite minimal diversity of citizenship exists

18   under section 1332(d)(2) because at least one plaintiff is a citizen of a state different

19   from at least one defendant.

20   9. On information and belief, Plaintiff Jamie Acio is a California citizen. *Id.*

21   ¶ 6.  Plaintiff Acio alleges that he is "residing in the State of California", that the

22   loan at issue is on his residence and Defendants are attempting to dispossess him of

23   his residence, and that he seeks to stop foreclosure on this property. *Id.* ¶¶ 3-4, 6,

24   358-365.  As such, the FAC demonstrates Plaintiff is a citizen of California.

25   10.   On information and belief, 190 other Plaintiffs are also California

26   citizens.  In each case, the FAC alleges that these 190 individuals reside in the State

27   of California, that a loan at issue is on his or her residence and Defendants are

28   attempting to dispossess him or her of the residence, and that he or she seeks to stop

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

1   foreclosure on this property. *Id.*, ¶¶ 3-4, 6-149, 154-157, 160, 162-167, 169-177,

2   179, 181-182, 184-185, 188-194, 196-200, 202, 204-205, 207-211, 358-365.  As

3   such, the FAC demonstrates that these 190 other Plaintiffs are all citizens of

4   California.

5        11.    On information and belief, the remaining 16 Plaintiffs are citizens of

6   Nevada, Mississippi, Arizona, Florida, Maryland, Illinois, or Virginia.  In each case,

7   the FAC alleges that these 16 Plaintiffs reside in one of those seven states, that a

8   loan at issue is on his or her residence and Defendants are attempting to dispossess

9   him or her of the residence, and that he or she seeks to stop foreclosure on this

10  property. *Id.*, ¶¶ 3-4, 150-153, 158-159, 161, 168, 178, 180, 183, 186-187, 195,

11  201, 203, 206, 358-365.  As such, the FAC demonstrates that these 16 Plaintiffs are

12  citizens of one of those seven states.

13       12.    Defendant Alliance Mortgage Company dba BNY Mortgage is now

14  known as EverHome Mortgage Company and is Defendant EverHome Mortgage

15  Company.  Defendant EverHome Mortgage Company is incorporated in Florida and

16  with its principal place of business in Jacksonville, Florida.  See Declaration of

17  Alice Gronert ¶ 3, attached as **Exhibit 4**.  Thus, for citizenship purposes, EverHome

18  is a citizen of Florida.  28 U.S.C. § 1332(c)(1).

19       13.    At Least $5,000,000 in Controversy.  Although Plaintiffs do not plead a

20  specific damages amount, there is more than $5,000,000 in controversy in this

21  action.  Under 28 U.S.C. section 1332(d), as amended by CAFA, the amount in

22  controversy in a putative class action (defined to include a "mass action" such as

23  this one) is determined by aggregating the amount at issue in the claims of all

24  members of the putative class.  28 U.S.C. § 1332(d)(6).

25       14.    Plaintiffs plead that they are entitled not just to general compensatory

26  damages, but also punitive damages, attorneys' fees, injunctive relief, and a

27  judgment declaring that the mortgages are "void."  FAC, p. 94 (prayer for relief).

28  The aggregate value of these forms of relief, as a matter of law, all count toward the

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

1  $5,000,000 jurisdictional amount. 28 U.S.C. § 1332(d)(6); *Amezcua v. Cellco*

2  *Partnership*, No. 08-cv-04390, 2009 WL 1190553, at *3 (N.D. Cal. May 3, 2009)

3  (punitive damages); *Brady v. Mercedes-Benz USA, Inc.*, 243 F. Supp. 2d 1004,

4  1010-11 (N.D. Cal. 2002) ("a reasonable estimate of fees likely to be incurred to

5  resolution" counts toward the amount in controversy); *Cohn v. PetSmart, Inc.*, 281

6  F.3d 827, 840 (9th Cir. 2002) (injunctive relief); *Century Sur. Co. v. J Quinn*

7  *Constr.*, No. CV 09-06085 DDP (JEMx), 2010 U.S. Dist. LEXIS 11883, at *8-9

8  (C.D. Cal. Jan. 20, 2010) (declaratory relief).

9      15.    First, at minimum, the amount in controversy is at least each Plaintiff's

10  outstanding principal balance that they seek to void (in addition to Plaintiffs' claims

11  for actual damages, statutory damages, punitive damages, restitution, and attorney's

12  fees). FAC, p. 1 ("including declaratory and injunctive relief to void mortgage"), 94

13  (prayer for relief). It is well-established that where a plaintiff seeks declaratory or

14  injunctive relief, the amount in controversy for removal jurisdiction purposes is

15  measured by the value of the object of the litigation. *Cohn v. Petsmart*, 281 F.3d

16  837, 840 (9th Cir. 2002); *accord Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S.

17  333,347 (1966). Where, as here, a Plaintiff effectively seeks rescission or

18  invalidation of a note and mortgage (or deed of trust), the object of the litigation is

19  the loan. *Olander v. ReconTrust Corp.*, No C11-177-MJP, 2011 WL 841313, at *2

20  (W.D. Wash. Mar. 7, 2011); *Ngoc Nguyen v. Wells Fargo Bank, N.A.*, No. C-10-

21  4081-EDL, 2010 WL 4348127, at *5-6 (N.D. Cal. Oct. 27, 2010). As such, the

22  value of the relief of rescission or invalidation may also be measured by the current

23  outstanding principal amount of the loan. *See Olander*, 2011 WL 841313, at *2-3;

24  *Garcia v. Citibank, N.A.*, No. 2:09-CV003387-JAM-DAD, 2010 WL 1658569, at *2

25  (E.D. Cal. Apr. 23, 2010).

26      16.    Here, although Defendants do not concede that Plaintiffs allegations are

27  accurate, three Plaintiffs allege a relationship with EverHome. FAC ¶¶ 100, 173,

28  210. The current outstanding loan balances for these three Plaintiffs total

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

1 approximately $774,251. *See* Declaration of Alice Gronert ("Second Gronert

2 Declaration") ¶¶ 6-8, attached as **Exhibit 5**.

3        17.      Thus, the outstanding loan principal of the remaining 203 Individual

4 Plaintiffs need only be $4,225,749, or approximately $20,817 each, to meet the

5 $5,000,000 threshold. Based on the outstanding loan balance of the three Plaintiffs

6 who allege a relationship with EverHome – who have an average loan balance of

7 approximately $ $258,083.67, it is more likely that not that together, the aggregate

8 outstanding loan balances of the remaining 203 Plaintiffs exceed the $4,225,749

9 required to meet the $5,000,000 threshold. FAC ¶¶ 224, 251; *Guglielmino v. McKee*

10 *Foods Corp.*, 506 F.3d 696, 699 (9th Cir. 2007) ("more likely than not" standard

11 applies to amount in controversy under CAFA).

12        18.      Moreover, the initial Complaint in this action alleged each of those

13 Plaintiffs' approximate outstanding loan balance. *See* Complaint, ¶¶ 21-168. The

14 loan balances of those Plaintiffs who are also named in the FAC as alleged in the

15 Complaint total more than $64 million. *Id.* ¶¶ 21-69, 71-105, 107-165, 167-168.

16        19.      In determining the amount in controversy, the Court may consider these

17 allegations in the original Complaint, which are factual admissions by Plaintiffs.

18 *See Kosen v. Ruffing*, No. 08-cv-0793-LAB (WMC), 2009 WL 56040 (S.D. Cal.

19 Jan. 7, 2009) (finding jurisdiction and denying remand where plaintiff admitted

20 amount in controversy requirement was met); *American Title Ins. Co. v. Lacelaw*

21 *Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings . . . are

22 considered judicial admissions conclusively binding on the party who has made

23 them."); *Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996) (even when

24 superseded, complaint "still remains as a statement once seriously made by an

25 authorized agent, and as such it is competent evidence of the facts stated."); *accord*

26 *Unicom Systems Inc v. Electronic Data Systems, Corp.*, No. CV 04-6716-

27 AHM(RZx), 2005 WL 5801534, at *11 (C.D. Cal. Nov. 1, 2005); *SST Sterling*

28

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

1   *Swiss Trust 1987 AG v. New Line Cinema Corp.*, No. CV 05-2835-DSF(VBKx),

2   2005 WL 6141290, at *2 n.1 (C.D. Cal. Oct. 31, 2005).[2]

3       20.   Plaintiffs alternately claim they have been damaged "in a sum

4   according to proof, which – inclusive of all damages, costs and attorneys' fees – is

5   equal to or less than $70,000 for each Plaintiff," or "in a sum less than $75,000."

6   *See, e.g.*, FAC ¶¶ 343, 394.  Even taking Plaintiffs' assertions at face value, if each

7   of the 207 Plaintiffs seeks actual damages of $70,000, then the aggregate amount

8   sought is $14.49 million, and the $5,000,000 jurisdictional threshold is easily

9   satisfied, without counting the value of any other form of relief Plaintiffs seek here.

10      21.   Although no more is needed, it is also true that "special" or "punitive"

11  damages are treated as part of the amount in controversy for purposes of removal.

12  "Where both actual and punitive damages are recoverable under a complaint each

13  must be considered to the extent claimed in determining jurisdictional amount."

14  *Bell v. Preferred Life Assurance Soc'y*, 328 U.S. 238, 240 (1943).  *See also*

15  *Amezcua*, 2009 WL 1190553, at *3 (stating that claims for punitive damages are

16  generally considered part of the amount in controversy, provided that the underlying

17  compensatory damages are not "speculative"); *Coren v. Mobil Entm't, Inc.*, No. 08-

18  cv-05264, 2009 WL 764883, at *2 (N.D. Cal. Mar. 19, 2009) (same).  In light of

19  Supreme Court precedent, and while Defendants deny that punitive damages are

20  recoverable in any amount, Plaintiffs' FAC puts them "in controversy" and it is

21  reasonable to assume that Plaintiffs will seek to recover punitive damages equal to

22  at least four times the amount of actual damages. *See State Farm Mut. Auto. Ins.*

23  ────────────────────

[2] *See also Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705, 707 (2d Cir.
24  1989) ("The amendment of a pleading does not make it any less the admission of the
    party."); *Reichert v. General Ins. Co.*, 68 Cal. 2d 822, 836 (1968) (in California,
25  "[t]he doctrine of judicial admissions is not limited to verified complaints . . . but
26  applies to unverified complaints as well"); *Friedberg v. Friedberg*, 9 Cal. App. 3d
    745, 761 (1970) (party amending pleading to suppress damaging admission in the
27  original pleading will be held to damaging admission, unless original statement was
28  due to mistake, inadvertence, or an inadequate knowledge of facts).

1 *Co. v. Campbell*, 538 U.S. 408, 425 (2003) (recognizing that the Court has upheld

2 punitive damages awards up to four times the amount of compensatory damages).

3    22.    Accordingly, based on Plaintiffs' own allegations in the FAC and the

4 Complaint, and the various forms of relief sought against Defendants, there are

5 reasonable grounds to conclude that Plaintiffs have put at least $5,000,000 in

6 controversy.  At minimum, it is "more likely than not" that the amount in

7 controversy exceeds $5,000,000. *See Guglielmino*, 506 F.3d at 699 (9th Cir. 2007);

8 *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) (stating that

9 it need only be "more likely than not" that the amount in controversy exceeds

10 required jurisdictional minimum).  The CAFA jurisdictional requirement for

11 removing a mass action is thus met.

12    23.    <u>At Least One Plaintiff With More than $75,000 in Controversy</u>.

13 Moreover, at least one Plaintiff meets the $75,000 jurisdictional threshold for

14 traditional diversity jurisdiction, as required under 28 U.S.C. section

15 1332(d)(11)(B). *See Abrego Abrego v. Dow Chemical Co.*, 443 F.3d 676, 689 (9th

16 Cir. 2006); Second Gronert Declaration ¶ 5, 6.

17                          <u>CAFA Exceptions Do Not Apply</u>

18    24.    Although Defendants deny that it is their burden to show that none of

19 the exceptions to jurisdiction in 28 U.S.C. sections 1332(d)(11) apply, none do.  *See*

20 *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1019 ("The structure of the statute and

21 the long-standing rule on proof of exceptions to removal dictate that the party

22 seeking remand bears the burden of proof as to any exception under CAFA.").

23    25.    This action does not fit within any of the exceptions set forth in 28

24 U.S.C. section 1332(d)(11)(B)(ii) to an action being a "mass action"; in particular, it

25 is not an action in which all the claims made in the case are asserted on behalf of the

26 general public and not on behalf of individual claimants (*see* 28 U.S.C.

27 §1332(d)(11)(B)(ii)(III)).  Likewise, this action does not arise exclusively from

28 events or occurrences in California:  Plaintiffs reside not only in California, but also

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

1    Nevada, Mississippi, Arizona, Florida, Maryland, Illinois, and Virginia, and allege a

2    conspiracy among multiple defendants regarding loans that were not all negotiated

3    or made in California (*see* 28 U.S.C. §1332(d)(11)(B)(ii)(I)).  FAC ¶¶ 150-153, 158-

4    159, 161, 168, 178, 180, 183, 186-187, 195, 201, 203, 206.

5         26.    Additionally, although more than two-thirds of the Plaintiffs are, on

6    information and belief, citizens of California, the state in which the State Court

7    Action was filed, *see*, *supra*, ¶¶ 9-11,  mandatory declination of jurisdiction under

8    28 U.S.C. section 1332(d)(4) does not apply.[3]

9         27.    First, the mandatory declination of jurisdiction provision set forth in

10   section 1332(d)(4)(A) does not apply because, *inter alia*, in the preceding three

11   years, a class action was filed asserting the same or similar factual allegations

12   against at least one of the defendants here (America's Servicing Company) on

13   behalf of the same or other persons. *See* 28 U.S.C. § 1332(d)(4)(A)(ii); *HPG Corp.*

14   *v. Countrywide Home Loans,* Case No. 2:10-CV-00945-JST-SS, Docket No. 1,

15   (C.D. Cal. Feb. 8, 2010) (complaint alleging wrongful foreclosure practices and

16   naming defendant America's Servicing Company). *See also, e.g., National*

17   *Organization of Assistance For Homeowners v. Wells Fargo Bank, N.A. et al*, No.

18   8:11-cv-00589-DOC -JC, Docket No. 1, (C.D. Cal. Feb. 8, 2010) (Notice of

19   Removal).

20        28.    Second, the mandatory declination of jurisdiction provision set forth in

21   section 1332(d)(4)(B) does not apply because not all of the "primary" defendants are

22   citizens of California, the state in which the State Court Action was filed.  Although

23   not defined in CAFA and not squarely addressed by the Ninth Circuit, other courts

24   have defined "primary defendant" to include a defendant "(1) who has the greater

---

[3]  The discretionary factors in section 1332(d)(3) do not apply because more than one-third of the Plaintiffs are alleged to be citizens of California. 28 U.S.C. § 1332(d)(3) (district court "may ... decline jurisdiction ... over class in which greater than one-third but less than two-thirds" of the plaintiffs are citizens of the state where the action is filed).

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

1    liability exposure; (2) is most able to satisfy a potential judgment; (3) is sued

2    directly, as opposed to vicariously, or for indemnification or contribution; (4) is the

3    subject of a significant portion of the claims asserted by plaintiffs; or (5) is the only

4    defendant named in one particular cause of action." *Brook v. UnitedHealth Group,*

5    *Inc.*, 2007 WL 2827808, *5 (S.D.N.Y. Sept. 27, 2007) (citing cases). Courts also

6    distinguish primary defendants from non-primary defendants as those against whom

7    plaintiffs seek to hold directly, rather than derivatively, liable. *See Corsino v.*

8    *Perkins,* 2010 WL 317418, *7 (C.D. Cal. Jan. 19, 2010) ("there seems to be a settled

9    judicial understanding of 'primary defendants' as those parties having a dominant

10   relation to the subject matter of the controversy, in contrast to other defendants who

11   played a secondary role by merely assisting in the alleged wrongdoing, or who are

12   only vicariously liable") (quoting *McClendon v. Challenge Financial Investors*

13   *Corp.*, No. 1:08CV1189, 2009 WL 589245, *13 (N.D. Ohio Mar. 9, 2009)).

14   Finally, "[m]any courts agree that the term the primary defendants means that *all*

15   primary defendants must be citizens of the state concerned." *Id.* at *5 (internal

16   quotation marks and citations omitted; emphasis added) (citing cases).

17        29.    Here, not all of the primary defendants are California citizens.

18   Defendant EverHome, as explained above, is a citizen of Florida. *See, supra* ¶ 12.

19   Additionally, the FAC alleges that Defendant America's Servicing Company is an

20   Iowa corporation and that it serviced 30 Plaintiffs' loans; that American Home

21   Mortgage Servicing Inc. is a Delaware corporation and serviced 16 Plaintiffs' loans;

22   that Select Portfolio Servicing is a Utah corporation and serviced 12 Plaintiffs'

23   loans; and that ING Direct is a Delaware corporation and 5 Plaintiffs' loans. FAC at

24   3 (caption), ¶¶ 6-62, 174-178, 193, 201. On information and belief, none of the

25   principal places of business (for corporations and non-bank defendants) or home

26   offices (for national bank defendants) for these defendants are located in California.

27   At least 66 of the Plaintiffs have thus raised claims against, and seek recovery

28   directly from, these non-California Defendants. Accordingly, many of the primary

1  defendants are not citizens of California, and this exception to the court's

2  jurisdiction does not apply.

3      30.    The exceptions in 28 U.S.C. section 1332(d)(5) and (9) also do not

4  apply here.  The exceptions in section 1332(d)(5) apply where a State, State official,

5  or State entity is a party or where there are less than 100 plaintiffs.  The exceptions

6  in section 1332(d)(9) apply to actions that solely involve specific claims related to

7  (1) covered securities as defined by the Securities Act of 1933 and the Securities

8  Exchange Act of 1934, (2) internal affairs or corporate governance, and (3) rights,

9  duties and obligations in the securities.

10     31.    Therefore, because this case meets the requirements for a "mass

11 action," including the requirements of 28 U.S.C. section 1332(d)(2)-(10), it is a

12 "mass action" removable under CAFA.

13 **III.   PROCEDURAL REQUIREMENTS FOR REMOVAL**

14     32.    Removal to Proper Court.  This Court is part of the "district and

15 division" embracing the place where this action was filed—Santa Ana, California.

16 *See* 28 U.S.C. §§ 1441(a)-(b), 1446(a).  Venue is proper in this district pursuant to

17 28 U.S.C. section 1391.

18     33.    Removal is Timely.  Defendant first received notice of this action

19 under 28 U.S.C. section 1446(b) when it was served with the FAC on March 21,

20 2011.  This Notice of Removal is filed within thirty days after Defendant's receipt

21 of the initial pleading alleging a basis for removal as required by 28 U.S.C. section

22 1446(b), and the removal is proper based upon original jurisdiction. Therefore, the

23 requirements of 28 U.S.C. section 1441(a) and (c) are met in that the entire case may

24 be removed to this Court.

25     34.    Consent to Removal.  For a removal under CAFA, unanimous consent

26 of all Defendants is not required.  28 U.S.C. § 1453(b).

27     35.    Notice.  Pursuant to the provisions of 28 U.S.C. section 1446,

28 Defendants will promptly serve on Plaintiffs' counsel a Notice of Removal to All

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

1   Adverse Parties, a true and correct copy of which (without exhibits) is attached

2   hereto as **Exhibit 6**.  Defendant will also promptly file with the Clerk of the

3   Superior Court of the State of California, County of Orange, and serve on adverse

4   parties' counsel, a Notice of Filing of Notice of Removal to Federal Court, a true

5   and correct copy of which (without exhibits) is attached hereto as **Exhibit 7**.

6       36.   <u>Pleadings and Process</u>.  A copy of the Complaint and all other

7   pleadings and papers received by Defendants and pending in the Superior Court of

8   the State of California, County of Orange, is attached hereto as **Exhibit 3**.

9       37.   <u>Signature</u>. This Notice of Removal is signed pursuant to Federal Rule

10  of Civil Procedure 11. *See* 28 U.S.C. § 1446(a).

11      38.   <u>Bond and Verification</u>.  Pursuant to section 1016 of the Judicial

12  Improvements and Access to Justice Act of 1988, no bond is required in connection

13  with this Notice of Removal.  Pursuant to section 1016 of the Act, this Notice need

14  not be verified.

15      39.   Based upon the foregoing, this Court has jurisdiction over this matter

16  pursuant to 28 U.S.C. section 1332(d), and the claims should be adjudicated in this

17  Court, as the action is properly removed thereto under 28 U.S.C. sections 1441,

18  1446, and 1453.

19      40.   In the event that Plaintiffs file a motion for remand, or the Court

20  considers remand *sua sponte*, Defendants respectfully request the opportunity to

21  submit such additional argument or evidence in support of removal as may be

22  appropriate.

23

24

25

26

27

28

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

WHEREFORE, this action should proceed in the United States District Court for the Central District of California, as an action properly removed thereto.

Respectfully submitted,

Dated:   April 20,. 2011          By: _____

STEVEN A. ELLIS
*sellis@goodwinprocter.com*
ALISON M. NORRIS
*anorris@goodwinprocter.com*
SHANNA M. RAMSOWER
*sramsower@goodwinprocter.com*
**GOODWIN PROCTER** LLP

Attorneys for Defendants:
*EverHome Mortgage Company, sued in
that name and as Alliance Mortgage
Company dba BNY Mortgage*

Goodwin Procter LLP
601 S Figueroa St., 41st Floor
Los Angeles, California 90017

# Exhibit 1

1  ROY CHESTER DICKSON, ESQ, SBN 105583
Law Offices of Dickson & Associates
2  2323 N. Tustin Avenue Suite I
Santa Ana, CA 92705
3  Tel. 1 (888) 777-9489
Fax. 1 (888) 503-2119
4  E-mail: lawsuit@homeownersclassaction.org

5  Attorneys for Plaintiffs

6

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**02/07/2011** at 10:50:29 AM
Clerk of the Superior Court
By Maarit H Nordman, Deputy Clerk

7          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8               **COUNTY OF ORANGE**

9

10                                      Judge David C. Velasquez

11  NATIONAL ORGANIZATION OF
ASSISTANCE FOR HOMEOWNERS OF          Case No.   30-2011-00447677-CU-OR-CXC
12  CALIFORNIA a dba FINANCIAL WELLNESS
FOR HOMEOWNERS OF ORANGE COUNTY       **COMPLAINT:**
13  CORPORATION a Non-Profit Homeowner
Organization representing Individual Members;
14  JAIME ACIO; DIVINA ARAGON; ARACELI      **1.    FRAUDULENT
ARREOLA; BRUCE BANH; ROGER           CONCEALMENT [VIOLATION OF CAL.
15  BARROW; PATRICIA CAMPOVERDE;         CIV. CODE §§ 1572, 1709 AND 1710];**
PAULINE CANAS; RUSTICO CORPUZ;
16  ANTONIO CUELLAR; TRAN DAO; THOMAS
DIEP; DARIO DRAKE; ARNOLD DYSICO;     **2.    INTENTIONAL
17  LYDIA EDEJER; DELFIN FAVORITO; JAIME   MISREPRESENTATION [VIOLATION
GUINTO; CARMEN GUTIERREZ; BEATRICE    OF CAL. CIV. CODE §§ 1572, 1709 AND
18  HERNANDEZ; TRACY HO; SUSAN HOANG;    1710];**
DE HUYNH; FELIPE R LOPEZ; MARIO
19  LOPEZ;; CHRISS NGUYEN; NORA ORTEZA;    **3.    NEGLIGENT
ROSITA QUEJADA; LYNN RAMOS;           MISREPRESENTATION [VIOLATION
20  MILAGROS REOTUTAR; MOISES            OF CAL.CIV. CODE §§ 1572, 1709 AND
RODRIGUEZ; CESAR SOLLA; HUMBERTO      1710];**
21  TORRES ARREOLA; KHEO TRAN; MARIA
TRUJILLO; RAFAEL VASQUEZ; ANA         **4.    INVASION OF
22  CALMA; FRANCISCO UBANA;JUAN          CONSTITUTIONAL RIGHT TO
BALTAZAR;TOMMY ENCINAS; SALVADOR     PRIVACY [VIOLATION OF CAL.
23  SASING,BRUCE BANH,BOBBY              CONST., ART. I, § 1];**
CABESAS,EDUARDO FERRER,MARIA
24  CORTEZ; ALAOLU AKANDE; EFREN AND     **5.    VIOLATION OF CALIFORNIA
VICTORIA RAMIN; EMERITA ROSS;         FINANCIAL INFORMATION PRIVACY
25  KHLOEUNG YOU;; MINH LY; JOSE CRUZ;    ACT [CAL. FIN. CODE §§ 4050 TO 4060];**
RACHEL LICUANAN; ALBERT SANFORD;
26                                      **6.    VIOLATION OF CAL., CIVIL
CODE § 2923.5;**
27

28                                  I

                              COMPLAINT

EXHIBIT 1   -14-

JESUS OROZCO; MICHAEL MCCARTHY; MODESTO JAOJOCO;GEORGE ROXAS; EDEN HERRERA , JAY McREYNOLDS , RAMON QUIZON , BULMARO MALDONADO, RODITHA CAMACHO, IGRID AGRA,MARIA LOURDES CABREROS, LOTA BAUTISTA, EVANGELINE BRIGHAM , ARTHUR LINDSEY, FELICIDAD DIAZ , MARIANO PINEDA, RODOLFO CAIREL, PLINYLOU FONDEVILLA , MARIANO TADEO , MANUEL HERNANDEZ  , JOSE MENDEZ, MARCIA GARCIA, CARLITO BUGAS, KATHRYN COWAN, MIRIAM ZUNIGA , PATRICIA DOMINICUS, ISABEL FERNANDEZ, GLORIA ENRIQUEZ , JOSELITO FABIONAR ,WILFREDO FUNTANILLA, ROSELLYN ROQUE , VIRGINIA SEBASTIAN, SENEN OCHOA,DANNY GARO,   ALLISON GORE , CECILIO GONZALEZ , MANOLO GONZALES  , JEANNIE HA ,  TIN NGUYEN , ROEL VILLANUEVA, NICOLAS GARCIA , NANSHI IGNACIO,AUGUSTO PAGTAKHAN,RENATO VIRAY, ALICIA CORNEJO,PABLO KISLANKA,SUZANNE LOBATO, ZENYMAE HARRINGTON, HIEU NGUYEN, XIONGH THAO, BOUA THAO, MICHAEL PHAN,IRENIO PADILLA, MANUEL VILLANEDA,CASSANDRA ANDRES, GUADALUPE GALVEZ, CELESTE RODGERS, JUDY BARTOLOME, ALLEN RICHARDSON, RAMON IILAN, CICERO VILLACORTA, MARIA ESQUIVAS, JENNIFER FABIA, ROBERTO de ALBA, MARTHA VARGAS, VIRGILIO VILANO, JOSE BALLESTEROS, MERLITA LAVARIAS, VIOLETA MARTINEZ,RICARDO ALATORRE, HANG DAN,ASCENCION CARILLO, ANTONIO FLORES, MEDINA ANGEL, COCKY BULL, VIRGINIA PANTALEON, JUAN MANUEL NUNEZ, ARACELI ALABEDA, THOMAS VUONG, SALVADOR TELLO, AUGUSTIN LUGUE, BENJAMIN CAPA, PAZ VERANO, SEUNG HEE UM,  MARIA LOURDES MAGLUPAY; JERROD LLOPIS, ANTONIO ALVE, MARY

7.      VIOLATION OF CAL., CIVIL CODE § 1798.82;

8.      UNFAIR COMPETITION [VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.]*

[JURY TRIAL DEMANDED]

2

COMPLAINT

EXHIBIT 1   -15-

1  JEAN PISCO,MENANDRO MIRANDA,
   SENEN OCHOA, NANCY HYSON individuals,
2  on behalf of themselves and all others on behalf
   of themselves and all others similarly situated,
3  ROES149 through 5000, inclusive

4
                         Plaintiffs,
5      vs.

6

7  AMERICA'S SERVICING COMPANY, a Iowa
   corporation; AMERICAN HOME MORTGAGE
8  SERVICING,INC, a Delaware corporation;
   SELECT PORTFOLIO SERVICING, a Utah
9  corporation; ING DIRECT, a Delaware
   corporation, BANK UNITED,FSB, a corporation,
10 OPTION ONE MORTGAGE, a corporation,
11 PEOPLE's CHOICE HOME LOAN INC, a
   corporation, BENIFICIAL CALIFORNIA INC, a
12 corporation, HSBC MORTGAGE
   CORPORATION, GATEWAY BANK, PHH
13 MORTGAGE, CENLAR LOAN
14 ADMINISTRATION, BAYVIEW LOAN
   SERVICES, FIRST FEDERAL BANK of CA,
15 FIRST FRANKLIN LOAN SERVICES,
   SOVEREIGN BANK, MIDWEST LOAN
16 SERVICES, UNION BANK, BANCO
   POPULAR, N.A., PROVIDENT FUNDING
17 ASSOCIATES, EVERHOME MORTGAGE
18 COMPANY, AEGIS WHOLESALE CORP.,
   WILSHIRE CREDIT UNION, TMST HOME
19 LOANS, INC, NATIONSTAR MORTGAGE,
   LLC,MOR EQUITY, FREEDOM MORTGAGE
20 CORPORATION, CARRINGTON
21 MORTGAGE SERVICE, LNG BEACH
   MORTGAGE CO., SUNTRUST MORTGAGE
22 INC., PNC FINANCIAL SERVICES, CATHAY
   BANK,HOMECOMINGS FINANCIAL,LLC,
23 QUANTUM SERVICING
   CORP.,SPECIALIZED LOAN SERVICING,
24 LLC, RCS, VERICREST FINANCIAL INC,
25 RESMAE MORTGAGE CORP, CMS,
   DESSERT COMMUNITY BANK,
26 CALDIRECT HOME LOAN, GREENPOINT
   MORTGAGE FUNDING,INC, MET LIFE,
27 MIRAD FINANCIAL GROUP, VANDERBILT
28 MORTGAGE,CAPITAL ONE MORTGAGE,

                        3

                    COMPLAINT

EXHIBIT 1   -16-

FIRST FEDERAL BANK, GE MONEY BANK, UNIVERSAL AMERICAN MORTGAGE COMPANY OF CA, BRENWARD MORTGAGE, BAYROCK MORTGAGE CORPORATION, and Does 1 to 1000, inclusive

Defendants

Plaintiffs, and each of them, hereby demand a jury trial and allege as follows;

## INTRODUCTION

1.     This lawsuit arises from: (i) Defendants' deception in inducing Plaintiffs to enter into mortgages from 2002 through 2007 with the Defendants (defined below in Paragraph 8); (ii) Defendants' breach of Plaintiffs' Constitutionally and statutorily protected rights of privacy; and (iii) Defendants' continuing torturous conduct intended to deprive Plaintiffs of their rights and remedies for the foregoing acts, described below.

2.     This action seeks remedies for the foregoing improper activities, including a massive fraud perpetrated upon Plaintiffs and other borrowers by the Defendants that devastated the values of their residences, in most cases resulting in Plaintiffs' loss of all or substantially all of their net worth.

3.     Defendants was among the leading providers of mortgages in California during all times relevant to this Complaint.

4.     The fraud perpetrated by the Defendants from 2003 through 2007, including by Defendants starting no later than 2007, was willful and pervasive.  It begin with simple greed and then accelerated when Defendants discovered that Defendants could not sustain its business, unless it used its size and large market share in California to systematically create false and inflated property appraisals throughout California.  Defendants then used these false property

4

COMPLAINT

EXHIBIT 1   -17-

valuations to induce Plaintiffs and other borrowers into ever-larger loans on increasingly risky terms.

5.　　　Hand-in-hand with its fraudulently-obtained mortgages, Defendants with other mortgage companies hatched a plan to "pool" the foregoing mortgages and sell the pools for inflated value.  Rapidly, these two intertwined schemes grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values – county-by-county, city-by-city, person-by-person – in order to take business from legitimate mortgage-providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagees on an unprecedented scale.

6.　　　From as early as 2004, Defendants' senior management *knew* the scheme would cause a liquidity crisis that would devastate Plaintiffs' home values and net worth.  But, they didn't care, because their plan was based on insider trading – pumping for as long as they could and then dumping before the truth came out and Plaintiffs' losses were locked in.

7.　　　At the very least, at the time of entering into the notes and deeds of trust[1] referenced herein with respect to each Plaintiff, Defendants, each Defendant originating a mortgage, each Defendant in the chain of title of the foregoing mortgages and each Defendant servicing the foregoing mortgages and the successors to each of the foregoing (collectively, the "*Defendants*") was bound and obligated to fully and accurately disclose to each borrower, including each Plaintiff herein,, that the mortgage being offered to the Plaintiff was, in fact, part of a massive fraud that Defendants knew would result in the loss of the equity invested by Plaintiff in his home and in severe impairment to Plaintiff's credit rating.

8.　　　It is now all too clear that this was the ultimate high-stakes fraudulent investment scheme of the last decade.  Couched in banking and securities jargon, the deceptive

gamble with consumers' primary assets – their homes – was nothing more than a financial fraud perpetrated by Dependants and others on a scale never before seen. This scheme led directly to a mortgage meltdown in California that was substantially worse than economic problems facing the rest of the United States. From 2008 to the present, Californians' home values decreased by considerably more than most of other areas in the United States as a direct and proximate result of the Dependants' scheme set forth herein. The Defendants Dependants' business premise was to leave the borrowers, including Plaintiffs, holding the bag once Defendants and its executives had cashed in reaping huge salaries and bonuses and selling Defendants' shares based on their inside information, while investors were still buying the increasingly overpriced mortgage pools and before the inevitable denouement. This massive fraudulent scheme was a disaster both foreseen by Defendants and waiting to happen. Defendants knew it, and yet Defendants still induced the Plaintiffs into their scheme without telling them.

9.     As a result, Plaintiffs lost their equity in their homes, their credit ratings and histories were damaged or destroyed, and Plaintiffs incurred material other costs and expenses, described herein. At the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees and generated billions of dollars in profits by selling their loans at inflated values.

10.     Like a drug that requires ever-higher doses to yield the same high, the fraud reached its zenith – or its nadir – when Defendants systematically destroyed California home values county-by-county and then State-wide.

11.     Then, Defendants began to use their customers' most private information for an extra "edge". This use of private information violated the inalienable Constitutional rights accorded to all California citizens. Defendants' violations ranged from the disclosure of the

6

COMPLAINT

EXHIBIT 1   -19-

most private and confidential information of more than 2.4 million customers, to the outsourcing and sale of hundreds of thousands of records to bolster their fraudulent scheme, disenfranchising Californians of their Article, § 1 inalienable rights of privacy, that went far beyond the sale of Private Information disclosed in the settlement of the Kentucky Class Action (defined below in Paragraph 270 and described herein).

12.    Since the time Plaintiffs filed the initial Complaint herein, Defendants' improper acts have continued, including, *inter alia*: (i) issuing Notices of Default in violation of Cal. Civil Code §2923.5; (ii) misrepresenting their intention to arrange loan modifications for Plaintiffs, while in fact creating abusive roadblocks to deprive Plaintiffs of their legal rights; and (iii) engaging in intrinsic fraud in this Court and in Kentucky by stalling in addressing Plaintiffs' legitimate requests to cancel notices of default and for loan modifications, and by refusing to respond, in any way, to Plaintiffs' privacy causes of action.

13.    In this Class Action Complaint, Plaintiff(s) seek, inter alia, the injunction of various foreclosure and eviction proceedings, for themselves and others similarly situated, based on the Defendants' routine failure to comply with statutory prerequisites to foreclosure. Plaintiffs and the class they seek to represent, also seek a determination of the validity of foreclosure sales held in violation of statutory requirements, together with damages and other relief.

14.    The State of California has longstanding, statutorily prescribed non-judicial foreclosure procedures, with minimal protections for homeowners. *Cal. Civil Code §2924 et seq.* Homes are normally foreclosed pursuant to the statutory power of sale, without a pre-foreclosure court hearing.

15.    The law is clear, however, that entities foreclosing on mortgages must strictly comply with the State's statutory prerequisites to foreclosure. Among other things, as a matter of black letter law, the entity exercising the right to foreclose must have actual legal authority to enter the property and/or exercise the power of sale. *Cal. Civil Code §725a, §726*

7

COMPLAINT

EXHIBIT 1   -20-

16.     In recent years, many foreclosing entities, including the Defendants, have dispensed with this fundamental requirement. Such entities foreclose, through their counsel, without having first obtained assignment of the mortgage and the power of sale on the property they purport to foreclose.

17.     California's foreclosure process has become an undisciplined and lawless rush to seize homes. Many thousands of foreclosures are plainly void under statute and settled California case law. Most borrowers never obtain accurate statutorily required notices, California Court judgments are entered based on inaccurate recitations concerning ownership of the mortgage, and homes are resold without a proper chain of title.

18.     Plaintiffs in this manner seek relief for the Defendants' wrongful foreclosure practices. They seek declaratory and injunctive relief concerning the validity of foreclosures conducted by entities who do not hold a power of sale at the time of the sale, injunction of eviction actions pending procedures to verify the validity of the underlying sales, injunction of upcoming sales where there is no proof of assignment, cancellation of fees and costs for invalid sale processes and damages.

19.     Plaintiffs seek such relief on their own behalf and behalf of a class of similarly situated individuals.

## PARTIES

20.     Plaintiff, National Organization of Assistance for Homeowners of California (NOAH-CA), a dba of Financial Wellness for Homeowners of Orange County Corporation (FWHOC)   with its principle place of business located at 500 North State College Blvd. Suite 1100, Orange, CA 92868. FWHOC is a nonprofit corporation organized and operated exclusively for educational and charitable purposes. Specifically, this organization has been formed to instruct and train individuals for the purpose of improving and developing their financial capabilities; provide administrative and formative support for the different homeowners

1   association who will be helping each member retain their homes and be financially well in time;

2   and provide relief to the poor, distressed and underprivileged

3   　　　21.　　　Plaintiffs JAIME ACIO  a member of NOAH-CA residing in the State of

4   California, who borrowed money from BNC Mortgage,Inc  or its subsidiaries or affiliates

5   between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California

6   real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or

7   

8   some other control capacity over processing the loan, with a principle balance of about $629,816.

9   　　　22.　　　Plaintiffs DIVINA ARAGON  a member of NOAH-CA residing in the State of

10   California, who borrowed money from Winstar Mortgage Partners, Inc or its subsidiaries or

11   affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their

12   California real estate.  At all times material hereto, America's Servicing Company has acted as

13   Servicer or some other control capacity over processing the loan, with a principle balance of

14   about $472,000.

15   

16   　　　23.　　　Plaintiffs ARACELI ARREOLA  a member of NOAH-CA residing in the State

17   of California, who borrowed money from Preferred Financial or its subsidiaries or affiliates

18   between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California

19   real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or

20   some other control capacity over processing the loan, with a principle balance of about $523,450.

21   

22   　　　24.　　　Plaintiffs BRUCE BANH  a member of NOAH-CA residing in the State of

23   California, who borrowed money from First California Mortgage or its subsidiaries or affiliates

24   between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California

25   real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or

26   some other control capacity over processing the loan, with a principle balance of about $480,000.

27   

28

25.     Plaintiffs ROGER BARROW  a member of NOAH-CA residing in the State of California, who borrowed money from Option One Mortgage or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $539,000.

26.     Plaintiffs PATRICIA CAMPOVERDE  a member of NOAH-CA residing in the State of California, who borrowed money from Preferred Financial Mortgage,Inc  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $491,250.

27.     Plaintiffs PAULINE CANAS  a member of NOAH-CA residing in the State of California, who borrowed money from Bryco Funding,Inc  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, American Home Mortgage  Servicing Company,Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $361,745.

28.     Plaintiffs RUSTICO CORPUZ  a member of NOAH-CA residing in the State of California, who borrowed money from Reunion Mortgage Inc  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $605,000.

29.      Plaintiffs ANTONIO CUELLAR  a member of NOAH-CA  residing in the State of California, who borrowed money from American Home Mortgage Acceptance,Inc or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, American Home Mortgage Servicing Company,Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $301,000.

30.      Plaintiffs TRAN DAO  a member of NOAH-CA  residing in the State of California, who borrowed money from American Home Mortgage Acceptance Inc or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, American Home Mortgage Servicing Company,Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $479,116.

31.      Plaintiffs THOMAS DIEP  a member of NOAH-CA  residing in the State of California, who borrowed money from American Home Mortgage Acceptance Inc or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, American Home Mortgage Servicing Company, Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $299,926.

32.      Plaintiffs DARIO DRAKES  a member of NOAH-CA  residing in the State of California, who borrowed money from Commonwealth Home Mortgage  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, American Home Mortgage Servicing

Company, Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $380.800.

33.     Plaintiffs ARNOLD DYSICO a member of NOAH-CA residing in the State of California, who borrowed money from First California Mortgage or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $746,250.

34.     Plaintiffs LYDIA EDEJER a member of NOAH-CA residing in the State of California, who borrowed money from DHI Mortgage Company, LTD or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $686,068.

35.     Plaintiffs DELFIN FAVORITO a member of NOAH-CA residing in the State of California, who borrowed money from Specialized Loan Servicing, LLC or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan. with a principle balance of about $110,500.

36.     Plaintiffs JAIME GUINTO a member of NOAH-CA residing in the State of California, who borrowed money from American Home Mortgage Servicing, Inc   or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, American Home Mortgage

12

COMPLAINT

EXHIBIT 1   -25-

Servicing, Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $ 425,176.

37.     Plaintiffs  CARMEN  GUTIERREZ  a member of NOAH-CA residing in the State of California, who borrowed money  The Mortgage Store Financial Inc from  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $339,047.00

38.     Plaintiffs  BEATRICE HERNANDEZ  a member of NOAH-CA residing in the State of California, who borrowed money  First National Bank from  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $605,652.

39.     Plaintiffs   TRACY HO   a member of NOAH-CA residing in the State of California, who borrowed money  Union Federal  Bank from  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $179,000.

40.     Plaintiffs SUSAN HOANG  a member of NOAH-CA residing in the State of California, who borrowed money  America's Wholesale Lender from  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as

EXHIBIT 1   -26-

Servicer or some other control capacity over processing the loan, with a principle balance of about $678,572.

41.     Plaintiffs  DE HUYNH  a member of NOAH-CA residing in the State of California, who borrowed money  Ameriquest Mortgage from  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $272,822.

42.     Plaintiffs  FELIPE LOPEZ  a member of NOAH-CA residing in the State of California, who borrowed money  American Brokers Conduit from  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, American Home Mortgage Servicing,Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $555,849.

43.     Plaintiffs  MARIO LOPEZ  a member of NOAH-CA residing in the State of California, who borrowed money  Central Banc Mortgage Corp from  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $335,000.

44.     Plaintiffs  ALICIA ANTONIA MALDONADO  a member of NOAH-CA residing in the State of California, who borrowed money  Bankers West Funding from  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company

has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $357,000.

45.     Plaintiffs CHRISS NGUYEN a member of NOAH-CA residing in the State of California, who borrowed money  Reunion Mortgage Funding  from  or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $427,500.

46.     Plaintiffs NORA ORTEZA  a member of NOAH-CA residing in the State of California, who borrowed money from Fremont  Investment & Loans or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $589,266.

47.     Plaintiff ROSITA QUIJADA a member of NOAH-CA residing in the State of California, who borrowed money from Option One Mortgage Corp or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate.  At all times material hereto, American Home Mortgage Servicing,Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $651,878.

48.     Plaintiff LYNN RAMOS  a member of NOAH-CA residing in the State of California, who borrowed money from American Brokers Conduit or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California

real estate. At all times material hereto, American Home Mortgage Servicing,Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $689,651.00.

49. Plaintiff MILAGROS REOTUTAR a member of NOAH-CA residing in the State of California, who borrowed money from Resmae Mortgage or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate. At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $600,000.00

50. Plaintiff MOISES RODRIGUEZ a member of NOAH-CA residing in the State of California, who borrowed money from Shasta Financial Service or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate. At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $234,857.97.

51. Plaintiff CESAR SOLLA a member of NOAH-CA residing in the State of California, who borrowed money from H&R Block Mortgage or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate. At all times material hereto, American Home Mortgage Servicing,Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $590,000.00.

52. Plaintiff HUMBERTO TORRES ARREOLA a member of NOAH-CA residing in the State of California, who borrowed money from First National Bank of Arizona or

its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $183,998.

53.     Plaintiff KHEO TRAN a member of NOAH-CA residing in the State of California, who borrowed money from America's Servicing Company or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $252,760.

54.     Plaintiff MARIA TRUJILLO a member of NOAH-CA residing in the State of California, who borrowed money from  First Franklin or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, America's Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $207,000.00.

55.     Plaintiff RAFAEL VASQUEZ  a member of NOAH-CA residing in the State of California, who borrowed money from American Brokers Conduit  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate.  At all times material hereto, American Home Mortgage Servicing,Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about 464,000.00.

56.     Plaintiff ANA CALMA a member of NOAH-CA residing in the State of California, who borrowed money from Executive Funding UT Inc  or its subsidiaries or affiliates

between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate. At all times material hereto, American Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $466,000.00

57.     Plaintiff FRANCISCO UBANA a member of NOAH-CA residing in the State of California, who borrowed money from Olympia Funding Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on their California real estate. At all times material hereto, American Home Mortgage Services Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $650,000.00.

58.     Plaintiff JUAN BALTAZAR a member of NOAH-CA residing in the State of California, who borrowed money from WMC Mortgage Corp. or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate. At all times material hereto, American Servicing Company has acted as Servicer or some other control capacity over processing the loan, with a principle balance of $485,035.00

59.     Plaintiff TOMMY ENCINAS a member of NOAH-CA residing in the State of California, who borrowed money from Option One Mortgage Corporation or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate. At all times material hereto, American Home Mortgage Servicing,Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $438,300.00.

60.     Plaintiff SALVADOR SASING a member of NOAH-CA residing in the State of California, who borrowed money from ING BANK, FSB or its subsidiaries or affiliates

between January 1, 2003 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, ING DIRECT has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $549,950.00.

61.   Plaintiff BRUCE BANH  a member of NOAH-CA residing in the State of California, who borrowed money from ING Bank FSBct or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate. At all times material hereto, ING Direct has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $352,000.00.

62.   Plaintiff BOBBY CABESAS  a member of NOAH-CA residing in the State of California, who borrowed money from Loan Management Services or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate.  At all times material hereto, SELECT PORTFOLIO SERVICES has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $416,331.44

63.   Plaintiff EDUARDO FERRER  are member of NOAH-CA residing in the State of California, who borrowed money from ING DIRECT or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, ING DIRECT has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $787,500.00

64.   Plaintiff MARIA CORTEZ  are member of NOAH-CA residing in the State of California, who borrowed money from  American Broker Conduit  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, American Home Mortgage Services, Inc has acted as

Servicer or some other control capacity over processing the loan, with a principle balance of about $396,000.00

65.     Plaintiff OLAOLU AKANDE  are member of NOAH-CA residing in the State of California, who borrowed money from National City Bank or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, American Home Mortgage Servicing Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $348,374.00

66.     Plaintiff EFREN RAMIN  are member of NOAH-CA residing in the State of California, who borrowed money from American Mortgage Network or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, American Home Mortgage Servicing Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $713,350.00

67.     Plaintiff EMERITA ROSS  are member of NOAH-CA residing in the State of California, who borrowed money from Secured Mortgage or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Select Portfolio Services  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $360,000.00

68.     Plaintiff KHLOEUNG YOU  are member of NOAH-CA residing in the State of California, who borrowed money from Americas Wholesale Lender or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Select Portfolio Services has acted as

20

COMPLAINT

EXHIBIT 1   -33-

Servicer or some other control capacity over processing the loan, with a principle balance of about $76,000.00

69.     Plaintiff KHLOEUNG YOU  are member of NOAH-CA residing in the State of California, who borrowed money from Americas Wholesale Lender or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Select Portfolio Servicing Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $85,500.00

70.     Plaintiff MINH LY a member of NOAH-CA residing in the State of California, who borrowed money from Century Mortgage Corporation  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California real estate.  At all times material hereto, Select Portfolio Services has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $440,000.00.

71.     Plaintiff JOSE CRUZ  are member of NOAH-CA residing in the State of California, who borrowed money from Master Financial Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Select Portfolio Servicing  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $218,738.00

72.     Plaintiff RACHEL LICUANAN are member of NOAH-CA residing in the State of California, who borrowed money from Green Point Mortgage or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Select Portfolio Servicing Inc has acted as

21

COMPLAINT

EXHIBIT 1   -34-

1  Servicer or some other control capacity over processing the loan, with a principle balance of

2  about $348,374.00

3      73.    Plaintiff ALBERT SANFORD  are member of NOAH-CA residing in the State

4  of California, who borrowed money from Mirad Financial Group or its subsidiaries or affiliates

5  between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California

6

7  real estate. At all times material hereto, Select Portfolio Servicing has acted as Servicer or some

8  other control capacity over processing the loan, with a principle balance of about $405,000.00

9      74.    Plaintiff JESUS OROZCO  are member of NOAH-CA residing in the State of

10  California, who borrowed money from Ace Mortgage Funding or its subsidiaries or affiliates

11  between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California

12

13  real estate. At all times material hereto, Select Portfolio Servicing  has acted as Servicer or some

14  other control capacity over processing the loan, with a principle balance of about $382,500.00

15      75.    Plaintiff MICHAEL MCCARTHY  a member of NOAH-CA residing in the

16  State of California, who borrowed money from ING DIRECT  or its subsidiaries or affiliates

17  between January 1, 2003 and December 31, 2007, secured by a deed of trust on her California

18

19  real estate. At all times material hereto, ING Direct has acted as Servicer or some other control

20  capacity over processing the loan with a principle balance of $600,000.00

21      76.    Plaintiff MODESTO JAOJOCO a member of NOAH-CA residing in the State

22  of California, who borrowed money from First Franklin a Division of Nat City Bank or its

23  subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of

24  trust on their California real estate.  At all times material hereto, SELECT PORTFOLIO

25  SERVICES has acted as Servicer or some other control capacity over processing the loan, with a

26  principle balance of about $560,000.00

27

28                                            22

                                       COMPLAINT

EXHIBIT 1   -35-

77.     Plaintiff GEORGE ROXAS a member of NOAH-CA residing in the State of California, who borrowed money from ING BANK FSB or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on their California real estate. At all times material hereto, ING DIRECT has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $500,000.00

78.     Plaintiff EDEN HERRERA are member of NOAH-CA residing in the State of California, who borrowed money from Bank United, FSB or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, Bank United, FSB has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $410,000.00

79.     Plaintiff JAY McREYNOLDS are member of NOAH-CA residing in the State of California, who borrowed money from Bank United, FSB or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, Bank United, FSB has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $

80.     Plaintiff RAMON QUIZON are member of NOAH-CA residing in the State of California, who borrowed money from Bank United, FSB or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, Bank United, FSB has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $765,407.48

81.     Plaintiff BULMARO MALDONADO are member of NOAH-CA residing in the State of California, who borrowed money from Bank United, FSB or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his

23

COMPLAINT

EXHIBIT 1   -36-

California real estate.  At all times material hereto, Bank United, FSB has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $432,000.00.

82.    Plaintiff RODITHA CAMACHO  are member of NOAH-CA residing in the State of California, who borrowed money from Bank United, FSB or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Bank United, FSB has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $1,009,095.71

83.    Plaintiff IGRID AGRA  are member of NOAH-CA residing in the State of California, who borrowed money from Option One Mortgage  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Option One Mortgage has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $297,727.03

84.    Plaintiff MARIA LOURDES CABREROS  are member of NOAH-CA residing in the State of California, who borrowed money from Option One Mortgage  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Option One Mortgage has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $427,450.00.

85.    Plaintiff LOTA BAUTISTA  are member of NOAH-CA residing in the State of California, who borrowed money from People's Choice Home  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California

real estate. At all times material hereto, People's Choice Home has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $384,000.00.

86.     Plaintiff EVANGELINE BRIGHAM  are member of NOAH-CA residing in the State of California, who borrowed money from Benificial  California Inc  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Benificial  California Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $577,912.26.

87.     Plaintiff ARTHUR LINDSEY  are member of NOAH-CA residing in the State of California, who borrowed money from Benificial  California Inc  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Benificial  California Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $642,382.35.

88.     Plaintiff FELICIDAD DIAZ  are member of NOAH-CA residing in the State of California, who borrowed money from Benificial  California Inc  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Benificial  California Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $426,089.98.

89.     Plaintiff MARIANO PINEDA  are member of NOAH-CA residing in the State of California, who borrowed money from Benificial  California Inc  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his

25

COMPLAINT

EXHIBIT 1   -38-

California real estate.  At all times material hereto, Benificial  California Inc  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $483,933.97.

90.      Plaintiff RODOLFO CAIREL  are member of NOAH-CA residing in the State of California, who borrowed money from HSBC Mortgage Corp  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, HSBC Mortgage Corp  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $395087.81.

91.      Plaintiff PLINYLOU FONDEVILLA  are member of NOAH-CA residing in the State of California, who borrowed money from Wilmington Finance  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, HSBC Mortgage Corp  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $360,000.00

92.      Plaintiff MARIANO TADEO  are member of NOAH-CA residing in the State of California, who borrowed money from Household Finance Corporation  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, HSBC Mortgage Corp  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $407,991.98.

93.      Plaintiff MANUEL HERNANDEZ  are member of NOAH-CA residing in the State of California, who borrowed money from Fieldstone Mortgage Company  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of

trust on his California real estate.  At all times material hereto, HSBC Mortgage Corp  has acted

as Servicer or some other control capacity over processing the loan, with a principle balance of

about $231,920.00.

94.     Plaintiff JOSE MENDEZ  are member of NOAH-CA residing in the State of

California, who borrowed money from HSBC Mortgage Corp  or its subsidiaries or affiliates

between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California

real estate.  At all times material hereto, HSBC Mortgage Corp  has acted as Servicer or some

other control capacity over processing the loan, with a principle balance of about $470,287.00.

95.     Plaintiff MARCIA GARCIA  are member of NOAH-CA residing in the State

of California, who borrowed money from Home American Credit, Inc  or its subsidiaries or

affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his

California real estate.  At all times material hereto, HSBC Mortgage Corp  has acted as Servicer

or some other control capacity over processing the loan, with a principle balance of about

$372,000.00.

96.     Plaintiff CARLITO BUGAS  are member of NOAH-CA residing in the State

of California, who borrowed money from CTW Financial Services  or its subsidiaries or

affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his

California real estate.  At all times material hereto, Gateway Bank  has acted as Servicer or some

other control capacity over processing the loan, with a principle balance of about $367,667.32.

97.     Plaintiff KATHRYN COWAN  are member of NOAH-CA residing in the State

of California, who borrowed money from PHH Mortgage or its subsidiaries or affiliates between

January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.

EXHIBIT 1   -40-

At all times material hereto, PHH Mortgage has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $591,639.92.

98.     Plaintiff MIRIAM ZUNIGA are member of NOAH-CA residing in the State of California, who borrowed money from Landmark Home Mortgage Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, PHH Mortgage has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $540,000.00.

99.     Plaintiff PATRICIA DOMINICUS are member of NOAH-CA residing in the State of California, who borrowed money from Long Mortgage Company or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, Cenlar Loan Administration has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $443,423.61.

100.    Plaintiff ISABEL FERNANDEZ are member of NOAH-CA residing in the State of California, who borrowed money from Interbay Funding,LLC or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, BayviewLoan Services has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $455,000.00

101.    Plaintiff GLORIA ENRIQUEZ are member of NOAH-CA residing in the State of California, who borrowed money from South Pacific Financial Corporation or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, First Federal Bank of California

has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $493,299.65.

102.     Plaintiff JOSELITO FABIONAR  are member of NOAH-CA residing in the State of California, who borrowed money from First Federal Bank of CA  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, First Federal Bank of California  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $493,299.65.

103.     Plaintiff WILFREDO FUNTANILLA  are member of NOAH-CA residing in the State of California, who borrowed money from First Federal Bank of CA  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, First Federal Bank of California  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $640,000.00.

104.     Plaintiff ROSELLYN ROQUE  are member of NOAH-CA residing in the State of California, who borrowed money from First Federal Bank of CA  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, First Federal Bank of California  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $295,520.28.

105.     Plaintiff VIRGINIA SEBASTIAN  are member of NOAH-CA residing in the State of California, who borrowed money from First Federal Bank of CA  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his

California real estate.  At all times material hereto, First Federal Bank of California  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $448,000.00.

106.    Plaintiff SENEN OCHOA  are member of NOAH-CA residing in the State of California, who borrowed money from First Franklin Loan Services  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, First Franklin Loan Services  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $504,000.00.

107.    Plaintiff DANNY GARO  are member of NOAH-CA residing in the State of California, who borrowed money from Federal Saving Bank  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Sovereign Bank  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $493,299.65.

108.    Plaintiff ALLISON GORE  are member of NOAH-CA residing in the State of California, who borrowed money from The Member Own FCU  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Midwest Loan Services  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $579,715.00.

109.    Plaintiff CECILIO GONZALEZ  are member of NOAH-CA residing in the State of California, who borrowed money from Washington Mutual Bank, FA  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, UNION BANK  has acted as Servicer or

some other control capacity over processing the loan, with a principle balance of about $435,000.00.

110.     Plaintiff MANOLO GONZALES  are member of NOAH-CA residing in the State of California, who borrowed money from Banco Popular,NA  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Banco Popular, NA  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $413,954.00.

111.     Plaintiff JEANNIE HA  are member of NOAH-CA residing in the State of California, who borrowed money from Provident Funding Associates,LP  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Provident Funding Associates,LP  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $253,600.00

112.     Plaintiff JOSELITO FABIONAR  are member of NOAH-CA residing in the State of California, who borrowed money from First Federal Bank of CA  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Provident Funding Associates, LP  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $493,299.65.

113.     Plaintiff TIN NGUYEN  are member of NOAH-CA residing in the State of California, who borrowed money from Concord Mortgage Company  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his

California real estate.  At all times material hereto, Provident Funding Associates, LP  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $331,617.00.

114.    Plaintiff ROEL VILLANUEVA  are member of NOAH-CA residing in the State of California, who borrowed money from Provident Funding Associates, LP  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Provident Funding Associates, LP has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $484,000.00.

115.    Plaintiff NICOLAS GARCIA  are member of NOAH-CA residing in the State of California, who borrowed money from Opteum Financial Services, LLC  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Everhome Mortgage Com  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $415,000.00.

116.    Plaintiff NANSHI IGNACIO  are member of NOAH-CA residing in the State of California, who borrowed money from Aegis Wholesale Corp  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Aegis Wholesale Corp  has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $400,000.00.

117.    Plaintiff AUGUSTO PAGTAKHAN  are member of NOAH-CA residing in the State of California, who borrowed money from BC Bancorp  or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California

COMPLAINT

EXHIBIT 1   -45-

real estate. At all times material hereto, Wilshire Credit Corporation has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $749,999.00.

118.     Plaintiff RENATO VIRAY are member of NOAH-CA residing in the State of California, who borrowed money from community Lending, Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, Wilshire Credit Corporation has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $491,250.00.

119.     Plaintiff ALICIA CORNEJO are member of NOAH-CA residing in the State of California, who borrowed money from First Street Financial Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, Wilshire Credit Corporation has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $577,583.01.

120.     Plaintiff PABLO KISLANKA are member of NOAH-CA residing in the State of California, who borrowed money from Transnational Financial Network or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, TMST Home Loans Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $620,000.00

121.     Plaintiff PABLO KISLANKA are member of NOAH-CA residing in the State of California, who borrowed money from Wells Fargo Bank,NA or its subsidiaries or affiliates

between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California

real estate. At all times material hereto, TMST Home Loans Inc has acted as Servicer or some

other control capacity over processing the loan, with a principle balance of about $800,00.00

122. Plaintiff SUZANNE LOBATO are member of NOAH-CA residing in the

State of California, who borrowed money from Guaranty Residential Lending, Inc or its

subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of

trust on his California real estate. At all times material hereto, Nationstar Mortgage LLC has

acted as Servicer or some other control capacity over processing the loan, with a principle

balance of about $278,000.00.

123. Plaintiff ZENY MAE HARRINGTON are member of NOAH-CA residing in

the State of California, who borrowed money from Nationstar Mortgage LLC or its subsidiaries

or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his

California real estate. At all times material hereto, Nationstar Mortgage LLC has acted as

Servicer or some other control capacity over processing the loan, with a principle balance of

about $540,000.00

124. Plaintiff HIEU NGUYEN are member of NOAH-CA residing in the State of

California, who borrowed money from Wilmington Finance, Inc or its subsidiaries or affiliates

between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California

real estate. At all times material hereto, MOR Equity has acted as Servicer or some other

control capacity over processing the loan, with a principle balance of about $441,750.00

125. Plaintiff XIONGH THAO are member of NOAH-CA residing in the State of

California, who borrowed money from Nationstar Mortgage LLC or its subsidiaries or affiliates

between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California

real estate. At all times material hereto, Freedom Mortgage Corporation has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $280,780.00.

126.   Plaintiff BOUA THAO are member of NOAH-CA residing in the State of California, who borrowed money from National City Bank or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, Freedom Mortgage Corp has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $285,000.00

127.   Plaintiff MICHAEL PHAN are member of NOAH-CA residing in the State of California, who borrowed money from Fremont Investment & Loan or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, Carrington Mortgage Service has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $475,000.00

128.   Plaintiff IRENEO PADILLA are member of NOAH-CA residing in the State of California, who borrowed money from Long Beach Mortgage Co or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, Long Beach Mortgage Co has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $441,338.92.

129.   Plaintiff MANUEL VILLANEDA are member of NOAH-CA residing in the State of California, who borrowed money from SunTrust Mortgage Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his

California real estate. At all times material hereto, SunTrust Mortgage Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $252,000.00.

130.     Plaintiff CASSANDRA ANDRES  are member of NOAH-CA residing in the State of California, who borrowed money from SunTrust Mortgage Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, SunTrust Mortgage Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $417,000.00.

131.     Plaintiff GUADALUPE GALVEZ  are member of NOAH-CA residing in the State of California, who borrowed money from SunTrust Mortgage Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, SunTrust Mortgage Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $315,000.00

132.     Plaintiff CELESTE RODGERS  are member of NOAH-CA residing in the State of California, who borrowed money from National City Bank or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate. At all times material hereto, PNC Financial Services has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $317,000.00

133.     Plaintiff JUDY BARTOLOME  are member of NOAH-CA residing in the State of California, who borrowed money from BNC Mortgage Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California

real estate.  At all times material hereto, PNC BANK has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $442,000.00

134.    Plaintiff ALLEN RICHARDSON  are member of NOAH-CA residing in the State of California, who borrowed money from Cathay Bank or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Cathay Bank has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $

135.    Plaintiff ALLEN RICHARDSON  are member of NOAH-CA residing in the State of California, who borrowed money from Cathay Bank or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Cathay Bank has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $437,679.00

136.    Plaintiff RAMON IILAN  are member of NOAH-CA residing in the State of California, who borrowed money from First Horizon Home Loans or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Homecomings Financial has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $350,938.68

137.    Plaintiff CICERO VILLACORTA  are member of NOAH-CA residing in the State of California, who borrowed money from Homecomings Financial, LLC or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Homecomings Financial has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $542,750.00.

138.    Plaintiff MARIA ESQUIVAS are member of NOAH-CA residing in the State of California, who borrowed money from American Brokers Conduit or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Quantum Servicing Corp has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $749,527.00.

139.    Plaintiff JENNIFER FABIA are member of NOAH-CA residing in the State of California, who borrowed money from First Street Financial, Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Quantum Servicing Corp has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $578,000.00

140.    Plaintiff ROBERTO de ALBA are member of NOAH-CA residing in the State of California, who borrowed money from Equifirst Corporation or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Specialized Loan Servicing has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $427,047.00.

141.    Plaintiff MARTHA VARGAS are member of NOAH-CA residing in the State of California, who borrowed money from Acoustic Home Loan,LLC or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Specialized Loan Servicing has acted as

Servicer or some other control capacity over processing the loan, with a principle balance of about $352,000.00

142.    Plaintiff VIRGILIO VILANO  are member of NOAH-CA residing in the State of California, who borrowed money from SCME Mortgage Bankers, INC or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Specialized Loan Servicing has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $445,602.00.

143.    Plaintiff JOSE BALLTEROS  are member of NOAH-CA residing in the State of California, who borrowed money from First Horizon Home Loans or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, MET Life has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $280,792.00.

144.    Plaintiff MERLITA LAVARIAS  are member of NOAH-CA residing in the State of California, who borrowed money from Mirad Financial Group or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Mirad Financial Group has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $608,000.00.

145.    Plaintiff VIOLETA MARTINEZ  are member of NOAH-CA residing in the State of California, who borrowed money from Bayrock Mortgage Corporation or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Vanderbilt Mortgage has acted as Servicer or

some other control capacity over processing the loan, with a principle balance of about $571,500.00.

146.     Plaintiff RICARDO ALATORRE  are member of NOAH-CA residing in the State of California, who borrowed money from Mortgage IT, Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, RCS has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $468,000.00.

147.     Plaintiff DAN HANG  are member of NOAH-CA residing in the State of California, who borrowed money from Finance America, LLC or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Vericrest Financial, Inc has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $455,937.50.

148.     Plaintiff ASCENCION CARILLO are member of NOAH-CA residing in the State of California, who borrowed money from ResMae Mortgage Corp or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, ResMae Mortgage Corp has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $341,250.00.

149.     Plaintiff ANTONIO FLORES are member of NOAH-CA residing in the State of California, who borrowed money from ResMae Mortgage Corp or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, ResMae Mortgage Corp has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $197,600.00.

150.     Plaintiff ANGEL MEDINA are member of NOAH-CA residing in the State of California, who borrowed money from New Century Mortgage Corp or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, CMS has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $217,600.00.

151.     Plaintiff COCKY BULL are member of NOAH-CA residing in the State of California, who borrowed money from Dessert Community Bank or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Dessert Community Bank has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $.

152.     Plaintiff VIRGINIA PANTALEON are member of NOAH-CA residing in the State of California, who borrowed money from GMAC Mortgage dba Cal Direct or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, CAL Direct Home Loan has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $220,000.00.

153.     Plaintiff Juan MANUEL are member of NOAH-CA residing in the State of California, who borrowed money from Prudential Lending Inc or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Greenpoint Mortgage Funding has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $584,000.00.

41

COMPLAINT

EXHIBIT 1    -54-

154.     Plaintiff ARACELI ABELEDA are member of NOAH-CA residing in the State of California, who borrowed money from Greenpoint Mortagage Funding or its subsidiaries or affiliates between January 1, 2003 and December 31, 2007, secured by a deed of trust on his California real estate.  At all times material hereto, Greenpoint Mortgage Funding has acted as Servicer or some other control capacity over processing the loan, with a principle balance of about $420,000.00.

155.     Plaintiffs THOMAS VUONG a member of NOAH-CA residing in the State of California, who borrowed money from Chevy Chase Bank, F.S.B or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, Capital One Mortgage has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $932,000.

156.     Plaintiffs SALVADOR TELLO a member of NOAH-CA residing in the State of California, who borrowed money from Chevy Chase Bank, F.S.B or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, Capital One Mortgage has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $419,388.66.

157.     Plaintiffs AUGUSTIN LUGUE a member of NOAH-CA residing in the State of California, who borrowed money from B.F. Saul Mortgage Company or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, Capital One Mortgage has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $572,850.

42

COMPLAINT

EXHIBIT 1   -55-

158. Plaintiffs BENJAMIN CAPA a member of NOAH-CA residing in the State of California, who borrowed money from First Federal Bank of California or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate. At all times material hereto, First Federal Bank of California/ West Point has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $458,000.

159. Plaintiffs PAZ VERANO a member of NOAH-CA residing in the State of California, who borrowed money from GE Money Bank or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate. At all times material hereto, GE Money Bank has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $648,000.

160. Plaintiffs SEUNG HEE UM a member of NOAH-CA residing in the State of California, who borrowed money from Universal American Mortgage Company of California or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate. At all times material hereto, Universal American Mortgage Company of California has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $406,750.

161. Plaintiffs SEUNG HEE UM a member of NOAH-CA residing in the State of California, who borrowed money from Westlend Financing, Inc. or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate. At all times material hereto, Brenward Mortgage has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $384,000.

162.    Plaintiffs MARIA LOURDES MAGLUPAY a member of NOAH-CA residing in the State of California, who borrowed money from BayRock Mortgage Corporation or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, BayRock Mortgage Corporation has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $468,000.

163.    Plaintiffs JERROLD LLOPIS a member of NOAH-CA residing in the State of California, who borrowed money from FIRST FRANKLIN Corporation or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, FIRST FRANKLIN Corporation has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $780,000.00.

164.    Plaintiffs ANTONIO ALVE a member of NOAH-CA residing in the State of California, who borrowed money from FIRST FRANKLIN FANKLIN FINANCIAL CORP Corporation or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, FIRST FRANKLIN Corporation has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $335,200.00.

165.    Plaintiffs MARY JEAN PISCO a member of NOAH-CA residing in the State of California, who borrowed money from Mortgageit, INC or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, FIRST FRANKLIN Corporation has acted as Servicer or

44

COMPLAINT

EXHIBIT 1   -57-

some other control capacity over processing the loan, with a principle balance of or about $480,000.00.

166.    Plaintiffs MENANDRO MIRANDA a member of NOAH-CA residing in the State of California, who borrowed money from First Franklin Financial Corp Corporation or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, FIRST FRANKLIN Corporation has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $452,000.00.

167.    Plaintiffs SENEN OCHOA a member of NOAH-CA residing in the State of California, who borrowed money from FIRST FRANKLIN Corporation or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, FIRST FRANKLIN Corporation has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $511,032.00.00.

168.    Plaintiffs NANCY HYSON a member of NOAH-CA residing in the State of California, who borrowed money from RBMG, INC or its subsidiaries or affiliates between January 1, 2002 and December 31, 2007, secured by a deed of trust on their California real estate.  At all times material hereto, EVERHOME MORTGAGE has acted as Servicer or some other control capacity over processing the loan, with a principle balance of or about $232,000.00.

169.    The other Plaintiffs, named as ROES 149 through 5000, are similarly situated to Plaintiffs identified above in that they too borrowed money from the Defendants (as defined below) between the dates beginning on January 1, 2002 and ending on December 31, 2007, secured by deeds of trust on their California realty.  Further, at all times material hereto,

Defendants have acted as Servicer or in another capacity with respect to loan processing. All of the foregoing secured real estate loans made to Plaintiffs were wrongfully and fraudulently handled and processed by Defendants, resulting in damages.

170.     Plaintiffs' counsel is aware of and has provided services to the remaining unnamed Roe plaintiffs, each of whom has sustained actual injury. The remaining Roes sue under their names fictitiously because they either wish to maintain their privacy or because Plaintiffs' counsel have not completed the due diligence necessary to properly plead their claims as of the filing of this Complaint. From time-to-time, upon conducting the due diligence and learning the information sufficient to add remaining Roe Plaintiffs to this action, Plaintiffs shall seek leave of Court to amend this Complaint to name these additional Roe Plaintiffs, or will follow such other process as is prescribed by the Court.

171.     An additional persons have contacted counsel or their staffs pertaining to the matters complained of herein. In the event Plaintiffs believe it is in furtherance of judicial economy and justice to all or any of these additional persons to this Complaint, Plaintiffs shall bring a noticed motion to add such parties to this action. In the event Plaintiffs file a separate lawsuit appertaining to all or any of these persons, or such further number as may exist in view of future developments, Plaintiffs shall file all appropriate Notices of Related Cases in accordance with California law, or as otherwise directed by the Court.

172.     At all times material hereto, all Defendants operated through a common plan and scheme designed to conceal the material facts set forth below from Plaintiffs, from the California public and from regulators, either directly or as successors-in-interest for others of the Defendants. The concealment was completed, ratified and/or confirmed by each Defendant herein directly or as a successor –in-interest for another Defendant, and each Defendant

performed the tortuous acts as set forth herein for its own monetary gain and as a part of a common plan developed and carried out with the other Defendants, or as a successor-in-interest to a Defendant that did the foregoing.

173.    The true names and capacities of the Defendants listed herein as DOES 2 through 1,000 are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names.  Each of the DOE Defendants was the agent or each of the other Defendants herein, named or unnamed, and thereby participated in all of the wrongdoing set forth herein.  On information and belief, each such Defendant is responsible for the acts, events and concealment set forth herein and is sued for that reason.  Upon learning the true names and capacities of the DOE Defendants, Plaintiffs shall amend this Complaint accordingly.

174.    Defendants' public disclosures, as reflected in its filings with the SEC, make clear that Defendants considers itself both a common enterprise operating as a greater whole and without meaningful distinctions as to its operating units, and the successor to Defendants and its subsidiaries.

175.    Plaintiffs are informed and believe, and thereon allege, that: (i) Defendants and its wholly-owned and controlled subsidiaries are liable for all wrongful acts of Defendants prior to the date thereof as the successor-in-interest to Defendants, (ii) Defendants directly and through its subsidiaries and other agents sued herein as Does have continued the unlawful practices of Defendants, including, without limitation thereof, writing fraudulent mortgages as set forth above and concealing wrongful acts that occurred in whole or in part prior thereto, and (iii) Defendants and its subsidiaries are jointly and severally liable as alter egos and as a single, greater unified whole.

## GENERAL FACTS

47

COMPLAINT

EXHIBIT 1   -60-

176.     The common facts herein include those facts set forth above in the prior sections of this Complaint.

177.     Under California Civil Code § 1709 it is unlawful to willfully deceived another "with intent to induce him to alter his position to his injury or risk."

178.     Under California Civil Code § 1710, it a "deceit" to do any one or more of the following: (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, (4) a promise, made without any intention of performing it.

179.     Under California Civil Code § 1572, the party to a contract further engages in fraud by committing "any other act fitted to deceive."

180.     At the time of entering into the notes and deeds of trust referenced herein with respect to each Plaintiff, the Defendants were bound and obligated to fully and accurately disclose:

    a.   Who the true lender and mortgagee were.

    b.   That to induce a Plaintiff to enter into the mortgage, the Defendants caused the appraised value of Plaintiff's home to be overstated.

    c.   That to disguise the inflated value of Plaintiff's home, Defendants as orchestrating the over-valuation of homes throughout Plaintiff's community.

    d.   That to induce Plaintiff to enter into a mortgage, the Defendants disregarded their underwriting requirements, thereby causing Plaintiff to falsely believe that

48

COMPLAINT

EXHIBIT 1   -61-

Plaintiff was financially capable of performing Plaintiff's obligations under the mortgage, when the Defendants knew that was untrue.

e.   The Defendants not only had the right to securitized and sell Plaintiff's mortgage to third-party investors, but that it specifically planned and intended to do so as to virtually all mortgages at highly-inflated and unsustainable values.

f.   That as to the intended sales:

  i.   The sales would include sales to nominees who were not authorized under law at the time to own a mortgage, including, among others, Mortgage Electronic Registration Systems Inc., a/k/a MERSCORP, Inc. ("*MERS*"), which according to its website was created by mortgage banking industry participants to be only a front or nominee to "streamline" the mortgage re-sale and securitization process;

  ii.   Plaintiff's true financial condition and the true value of Plaintiff's home and mortgage would not be disclosed to investors to whom the mortgage would be sold;

  iii.   Defendants intended to sell the mortgage together with other mortgages as to which it also intended not to disclose the true financial condition of the borrowers or the true value of their homes or mortgages;

  iv.   The consideration to be sought from investors would be greater than the actual value of the said notes and deeds of trust; and

  v.   The consideration to be sought from investors would be greater than the income stream that could be generated from the instruments event assuming a 0% default rate thereon;

49

COMPLAINT

EXHIBIT 1   -62-

g.  That the mortgage would thereby be used as part of a scheme by which the Defendants would bilk investors by selling collateralized mortgage pools at an inflated value.

h.  That, at the time they did the foregoing, the Defendants knew the foregoing would lead to a liquidity crisis and the likely collapse of Defendants;

i.  That the Defendants also knew the foregoing would lead to grave damage to each Plaintiff's property value and thereby result in Plaintiff's loss of the equity Plaintiff invested in his house, as well as damaging Plaintiff's credit rating, thereby causing Plaintiff additional severe financial damage; and

j.  That the Defendants knew at the time of making each loan, but did not disclose to Plaintiffs, that entire communities would become "ghost-town-foreclosure-communities" after a domino effect of foreclosures hit them.

181.    When property values started falling – just as Defendants knew would occur – Defendants could no longer continue the pretense, concealment and affirmative misrepresentations.  Plaintiffs through their losses, and then also the ultimate banker, the U.S. taxpayer, have footed the bill through TARP and other programs.  Still, Defendants continue to ratify the scheme, hide and destroy documents, and travel outside the United States to countries with treaties that do not allow for open discover, including, among others, India and Italy, in order to secrete witnesses and documents to make their scheme more difficult to prove.

182.    Further, in violation of their own underwriting guidelines, Defendants covertly offered Plaintiffs and others loans at a loan-to-value ratio that was unsustainable and without income verification.  The Defendants knew, but concealed from Plaintiffs that they knew,

50

COMPLAINT

EXHIBIT 1   -63-

Plaintiffs would soon be unable to afford the loans once introductory discount interest rates ended, and variable interest and balloon payments kicked in.

183.    The Defendants knew that when interest payments increased and balloon payments became due, if not before, Plaintiffs and others would begin defaulting on their mortgages and would suffer grievous losses from mortgages for which they were not qualified. Given the inflated appraised values of their residences, even without a decline in property values, few Plaintiffs would be able to refinance or sell their homes without suffering a significant loss.

184.    The Defendants knew that the scale of the lending – based on inflated property values, without income verification and in violation of numerous other Defendants underwriting guidelines – would lead to widespread declines in property values, thereby putting Plaintiffs and others into *extremis* through which they would lose the equity invested in their homes and have no means of refinancing or selling, other than at a complete loss.   That is precisely what happened to Plaintiffs herein.

185.    The Defendants did not just make misrepresentations and conceal material facts from investors.   First, each of the foregoing misrepresentations were made in public documents or forums given wide communication to the public, including Plaintiffs herein. Second, the identical affirmative misrepresentations and concealment pertained to the Plaintiffs, and other borrowers.   Defendants had to perpetuate their lies by affirmative misrepresentations and by concealing the truth from Plaintiffs and other borrowers because to do otherwise would mean: (a) immediate wash-back into their investor fraud since Plaintiffs and other borrowers are part of the investor public receiving all other investor communications, and (b) decapitation of the source of the supply of mortgages needed for the scheme.   Finally, the concealment from borrowers was absolutely essential because the Defendants knew they would soon be delivering

Plaintiffs' notes and deeds of trust to investors and their representatives at intentionally inflated values as collateral for Defendants' fraudulent securitized pools.

186.     By not disclosing the truth of their inflated appraisals, lax lending standards, deficient loan portfolio, shaky secondary market collateralized securities, and overall scheme to its borrowers, as set forth above, Defendants not only made them unwitting accomplices, but put them into a no-win situation in which the price of taking a mortgage from Defendants would be - and has been – cascading defaults and foreclosures that have wiped out billions of dollars in equity value, including the equity invested in their homes by Plaintiffs.  Cascading foreclosures in entire cities and counties in California leads to unemployment and economic turmoil.  All Plaintiffs have been damaged by the foregoing.  Despite billions of dollars of taxpayer-funded-relief programs, property values continue to fall and unemployment and underemployment remain terribly high.

187.     As defaults increased, the Defendants used it as an opportunity to increase their fees and to punish Plaintiffs and other borrowers.  That is why on June 7, 2010, the FTC announced that two Defendants mortgage servicing companies will pay $108 million to settle FTC charges that they collected excessive fees from cash-strapped borrowers who were struggling to keep their homes.  The $108 million represents one of the largest judgments imposed in an FTC case, and the largest ever in a mortgage servicing case.

188.     As FTC Chairman Jon Leibowitz explained in the FTCs press release announcing the settlement: "Life is hard enough for homeowners who are having trouble paying their mortgage.  To have a major loan servicer like Defendants piling on illegal and excessive fees is indefensible."

189.     The FTC press release further explained:

According to the complaint filed by the FTC, Defendants' loan-servicing operation deceived homeowners who were behind on their mortgage payments into paying inflated fees – fees that could add up to hundreds or even thousands of dollars.  Many of the homeowners had taken out loans originated or funded by Defendants's lending arm, including subprime or "nontraditional" mortgages, such as payment option adjustable rate mortgages, interest-only mortgages, and loans made with little or no income or asset documentation, the complaint states.

Mortgage servicers are responsible for the day-to-day management of homeowners' mortgage loans, including collecting and crediting monthly loan payments.  Homeowners cannot choose their mortgage servicer.

- - -

When homeowners fell behind on their payments and were in default on their loans, Defendants ordered property inspections, lawn mowing, and other services meant to protect the lender's interest in the property, according to the FTC complaint.  But rather than simply hire third-party vendors to perform the services, Defendants created subsidiaries to hire the vendors.  The subsidiaries marked up the price of the services charged by the vendors – often by 100% or more – and Defendants then charged the homeowners the marked-up fees.  The complaint alleges that the company's strategy was to increase profits from default-related

53

COMPLAINT

EXHIBIT 1   -66-

service fees in bad economic times.  As a result, even as the

mortgage market collapsed and more homeowners fell into

delinquency, Defendants earned substantial profits by funneling

default-related services through subsidiaries that it created solely to

generate revenue.

- - -

In addition, in servicing loans for borrowers trying to save their

homes in Chapter 13 bankruptcy proceedings, *the complaint*

*charges that Defendants made false or unsupported claims to*

*borrowers about amounts owed or the status of their loans.*

Defendants also failed to tell borrowers in bankruptcy when new

fees and escrow charges were being added to their loan accounts.

The FTC alleges that after the bankruptcy case closed and

borrowers no longer had bankruptcy court protection, Defendants

unfairly tried to collect those amounts, including in some cases via

foreclosure. [Emphasis supplied]

190.    Based upon the allegations of the FTC set forth in this Complaint, the Plaintiffs believe and thereon allege the same allegations herein.

191.    The Defendants concealed and did not accurately or fully disclose to any Plaintiff herein any of the foregoing facts.  Further, Defendants did not disclose or explain their scheme to Plaintiffs at any time.  They did the foregoing with the intent to deceive Plaintiffs and the investing public.  Plaintiffs did not know the massive scheme Defendants had devised.

192.    To the contrary, Defendants affirmatively misrepresented its underwriting processes, the value of its mortgages and the fundamental nature of its business model in its press releases, annual report and securities filings, all of which were widely distributed to the public, including Plaintiffs.  Defendants intended the public, including Plaintiffs, to rely upon its misrepresentations and made those misrepresentations to create false confidence in Defendants and to further its fraud on borrowers and investors.

193.    Plaintiffs would never have done business with the Defendants if Defendants had disclosed their scheme.  Had the Plaintiffs known the facts concealed from them by Defendants, Plaintiffs would have never entered into bogus and predatory transactions with the Defendants  designed only to line the pockets of Defendants and their executives and not to actually and justifiably create value and generate capital from the Plaintiffs' equity investments in their primary residences.

194.    If the Plaintiffs had later learned the truth, each Plaintiff would have either (a) rescinded the loan transaction under applicable law and/or (b) refinanced the loan transaction with a reputable institution prior to the decline in mortgage values in late 2008.  Instead, each Plaintiff reasonably relied on the deceptions of the Defendants in originating their loans and forbearing from exercising their rights to rescind or refinance their loans.

195.    After entering into the transactions with each Plaintiff herein as alleged herein, the Defendants, with the assistance of the other Defendants herein, sold in securities transactions the notes and deeds of trust pertaining to Plaintiffs' properties.  The sales:

      a.  Included sales to nominees who were not authorized under law at the time to own a mortgage, including, among others, MERS;

b.   Involved misrepresentations by Defendants to investors and concealment from investors of Plaintiff's true financial condition and the true value of Plaintiff's home and mortgage;

c.   Involved misrepresentations by Defendants to investors and concealment from investors of the true financial condition of other borrowers and the true value of their homes and mortgages also included in the pools;

d.   Were for considerations greater than the actual value of the said notes and deeds of trust;

e.   Were for consideration greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon; and

f.   Were part of a scheme by which the Defendants bilked investors by selling collateralized mortgage pools at an inflated value.

196.   Defendants hid from Plaintiffs that Defendants was engaged in an effort to increase market share and sustain revenue generation through unprecedented expansions of its underwriting guidelines, taking on ever-increasing credit risk.

197.   At the time the Defendants induced Plaintiffs to enter into mortgages, they knew their scheme would lead to a liquidity crisis and grave damage to each Plaintiff's property value and thereby result in each Plaintiff's loss of the equity such Plaintiff invested in his house, as well as damaging the Plaintiff's credit rating, thereby causing the Plaintiff additional severe financial damage consisting of the foregoing damages and damages described elsewhere in this Complaint.  The Defendants concealed the foregoing from Plaintiffs, California consumers and regulators, initially at Defendants' direction and thereafter at Defendants' direction.

198.    Based upon the Defendants' position as a leading financial institution and thereafter Defendants' position as a leading financial institution and the public statements made by the Defendants and otherwise by Defendants, including in their securities filings, the Plaintiffs reasonably relied upon the statements made by the foregoing and reasonably relied that no material information necessary to their decisions would be withheld or incompletely, inaccurately or otherwise improperly disclosed.  In so relying, the Plaintiffs were gravely damaged as described herein.  The Defendants acted willfully with the intention to conceal and deceive in order to benefit there from at the expense of the Plaintiffs.

199.    The other Defendants followed Defendants' direction because they are either subsidiaries of Defendants, directly or indirectly owned, controlled and dominated by Defendants, or because they are in an unequal economic and/or legal relationship with Defendants by which they are beholden to Defendants and are thereby controlled and dominated by Defendants.

200.    As a proximate and foreseeable result of the Defendants sale of the notes and deeds of trust regarding Plaintiffs' properties and others similarly situated for more than the actual value of such instruments, securitization pools lacked the cash flow necessary to maintain the securitization pools in accordance with their indentures.  The unraveling of the Defendants' fraudulent scheme has materially depressed the price of real estate throughout California, including the real estate owned by Plaintiffs, resulting in the losses to Plaintiffs described herein.

201.    After certain Plaintiffs filed the Complaint herein, Defendants, under direction of Defendants, covertly embarked a supplemental scheme to browbeat Plaintiffs into foregoing and waiving rights.    That scheme included, among other things, advising Plaintiffs that

Defendants would consider loan modifications, while at the same time covertly to obfuscate, badger, delay and divert the Plaintiffs from enforcing their rights.

202.    Defendant did not provide the information sought by Plaintiffs, did not facilitate the process of loan modifications and did not comply, in any material respect, with the spirit and intent of loan modifications requirements embodied in Cal. Civil Code § 2923.5 *et. seq.*, or the federal Helping Families Save Their Homes Act of 2009.

203.    At the same time, Defendants continue to issue notices of default in violation of Cal. Civil Code § 2923.5 and despite assurances that the failures will be remedied, corrective action is dilatory, at best.

204.    The foregoing is part of the ratification of the Defendants bad acts by Defendants.  Since acquiring Defendants in 2008, Defendants has accepted the benefits of Defendants' bad acts and ratified and adopted those acts with a concerted campaign to suppress Plaintiffs and others who seek to enforce their rights.  That campaign includes, among other components to be established through discovery:

    a.  The intentional use of Indian service centers and others to frustrate Plaintiffs and other borrowers seeking information about their mortgages and loan modifications.

    b.  Intentional violation of Cal. Civil Code §

205.    Defendants and the other defendants failed ever to inform this Court of the Kentucky Class Action, thereby when Defendants had failed to responsively plead to that cause of action herein when Defendants had failed to responsively plead to that cause of action for more than a year.  Despite numerous motions, hearings, mediation and settlement conferences, Defendants never disclosed to any of Plaintiffs, their counsel or the Court the existence of the

Kentucky Class Action or the Kentucky Settlement, even though they were fully aware of the foregoing and fully aware that the Kentucky Settlement purported to compromise and settle the privacy claims of Plaintiffs, even though Californians have unique and fundamental rights of privacy not enjoyed by other Americans.

206.    By the foregoing acts, Defendants is intentionally making it difficult or impossible for victims of Defendants' massive mortgage fraud and privacy violations to enforce their rights.  By taking these steps, Defendants accepts the benefits of Defendants' wrongful behavior and ratifies and adopts that behavior.

## FIRST CAUSE OF ACTION
### (By All Plaintiffs – Fraudulent Concealment – Against All Defendants)

207.    Paragraphs 1 through 206 are hereby incorporated by reference as though fully set forth herein.

208.    Defendants had exclusive knowledge not accessible to Plaintiffs of material facts pertaining to its mortgage lending activities that it did not disclose to Plaintiffs at the time it was entering into contracts with Plaintiffs.  As more fully alleged herein, these facts included false appraisals, violation of Defendants' underwriting guidelines, the intent to sell Plaintiffs' mortgages above their actual values to bilk investors and knowledge that the scheme would result in a liquidity crisis that would gravely damage Plaintiffs.

209.    Further, in connection with entering into contracts with Plaintiffs, Defendants made partial (though materially misleading) statements and other disclosures as to their prominence and underwriting standards in the public releases, on their web site, in their literature and at their branch offices.  However, Defendants suppressed material facts relating thereto as set forth above.  Defendants knew that the mortgages would be "pooled" and "securitized sale".  Defendants also knew that within a foreseeable period, its investors would discover that

Defendants' mortgagees could not afford their loans and the result would be foreclosures and economic devastation. It was the movie *The Sting* in real life, with real lives and with people whose homes were often times their only asset.

210.    Defendants was more dependent than many of its competitors on selling loans it originated into the secondary mortgage market, an important fact it disclosed to investors. Defendants expected that the deteriorating quality of the loans that Defendants was writing, and the poor performance over time of those loans, would ultimately curtail the company's ability to sell those loans in the secondary mortgage market.  Each of the foregoing was aware, but Defendants failed to disclose, that Defendants' business model was unsustainable.

211.    Defendants misled borrowers, potential borrowers and investors by failing to disclose substantial negative information regarding Defendants' loan products, including:

a.  The increasingly lax underwriting guidelines used by the company in originating loans;

b.  The company's pursuit of a "matching strategy" in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators;

c.  The high percentage of loans it originated that were outside its own already widened underwriting guidelines due to loans made as exceptions to guidelines;

d.  Defendants' definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality; and

e.  Defendants' subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates.

including reduced documentation, stated income, piggyback second liens, and LTVs in excess of 95%.

212.   Defendants knew this negative information from numerous reports they regularly received and from emails and presentations prepared by the company's chief credit risk officer.   Defendants nevertheless hid this negative information from the public, including Plaintiffs.

213.   Plaintiffs did not know the concealed facts.

214.   Defendants intended to deceive Plaintiffs. As described herein, that deception was essential to their overall plan to bilk investors, trade on inside information and otherwise pump the value of Defendants stock.

215.   Defendants was one of the nation's leading providers of mortgages.   It was highly regarded and by dint of its campaign of deception through securities filings, press releases, web site and branch offices, Defendants had acquired a reputation for performance and quality underwriting.   As a result, Plaintiffs reasonably relied upon the deception of the Defendants.

216.   As a proximate result of the foregoing concealment by Defendants, California property values have precipitously declined and continue to decline, gravely damaging Plaintiffs by materially reducing the value of their primary residences, depriving them of access to equity lines, second mortgages and other financings previously available based upon ownership of a primary residence in California, in numerous instances leading to payments in excess of the value of their properties, thereby resulting in payments with no consideration and often subjecting them to reduced credit scores (increasing credit card and other borrowing costs) and reduced credit availability.

217.     Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

218.     To this day, Defendants profess willingness to modify Plaintiffs' loans in accordance with law, but nonetheless they persist to this day in their secret plan to use Indian or other offshore servicing companies to deprive Plaintiffs of their rights.

219.     As a result of the foregoing, Plaintiffs' damages herein are exacerbated by a continuing decline in residential property values and further erosion of their credit records.

220.     Defendants' concealments, both as to their pervasive mortgage fraud and as to their purported efforts to resolve loan modifications with Plaintiffs, are substantial factors in causing the harm to Plaintiffs described in this Third Amended Complaint.

221.     Dependants acted outrageously and persistently with actual malice in performing the acts alleged herein and continue to do so. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## SECOND CAUSE OF ACTION
### (By All Plaintiffs – Intentional Misrepresentation – Against All Defendants)

222.     Paragraphs 1 through 221 are hereby incorporated by reference as though fully set forth herein.

COMPLAINT

EXHIBIT 1   -75-

223.     From 2002 through 2007, Defendants misled the public, including Plaintiffs, by falsely assuring them that Defendants was primarily a prime quality mortgage lender which had avoided the excesses of its competitors.   As described herein with specific examples, affirmative misrepresentations and material omissions permeated Defendants website, customer and investor materials, required securities filings and presentations.

224.     Without limiting the foregoing, Defendants Forms 10-K falsely represented that Defendants "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities," and the Forms 10-K falsely stated that Defendants ensured its continuing access to the mortgage backed securities market by "consistently producing quality mortgages."

225.     Defendants Forms 10-K deceptively described the types of loans upon which the Company's business depended.  While Defendants provided statistics about its originations which reported the percentage of loans in various categories, the information was misleading because its descriptions of "prime non-conforming" and "nonprime" loans in its periodic filings were insufficient to inform Plaintiffs what types of loans were included in those categories.

226.     Nothing in Defendants securities filings informed Plaintiffs that Defendants "prime non-conforming" category included loan products with increasing amounts of credit risk. While guidance issued by the banking regulators referenced a credit score ("FICO score") at 660 or below as being an indicator of a subprime loan, some within the banking industry drew the distinction at a score of 620 or below.  Defendants, however, did not consider any FICO score to be too low to be categorized within "prime".  Nor did Defendants definition of "prime" inform Plaintiffs that its "prime non-conforming" category included so-called "Alt-A" loan products with increasing amounts of credit risk, such as (1) reduced or no documentation loans; (2) stated income loans; and (3) loans with loan to value or combined loan to value ratios of 95% and

higher.   Finally, it did not disclose that Pay-Option ARM loans, including reduced documentation Pay-Option ARM loans, were include in the category of prime loans.

227.   Though Defendants proclaimed that it managed credit risk through its loan underwriting, the company's increasingly wide underwriting guidelines and exceptions process materially increased Defendants credit risk during that time.

228.   Defendants depended on its sales of mortgages into the secondary market as an important source of revenue and liquidity. As a result, Defendants was not only directly expose to credit risk through the mortgage-related assets on its balance sheet, but also indirectly exposed to the risk that the increasingly poor quality of its loans would prevent their continued profitable sale into the secondary mortgage market and impair Defendants liquidity. Rather than disclosing this increasing risk, Defendants gave false comfort, again touting Defendants loan quality. Accordingly, Defendants failure to disclose its widening underwriting guidelines and the prevalence of exceptions to those guidelines in 2005 and 2006 constituted material omissions from Defendants periodic reports.

229.   These documents contained misrepresentations as follows:

a.   First, Defendants' Forms 10-K for 2005, 2006, and 2007 stated that Defendants "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities" and touted the Company's "proprietary underwriting systems... that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud." These statements were false, because Defendants knew that a significant portion of Defendants' loans were being made as exceptions to Defendants' already extremely broad underwriting guidelines.

b. Second, Defendants stated in its 2005 Form 10-K: "We ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages… We make significant investments in personnel and technology to ensure the quality of our mortgage loan production." A virtually identical representation appears in Defendants' 2006 Form 10-K. These statements were false, because, as set forth in detail above, Defendants was aware that Defendants was originating increasing percentages of poor quality loans that did not comply with Defendants' underwriting guidelines.

c. Third, the descriptions of "prime non-conforming" and "subprime" loans in Defendants' Forms 10-K were misleading because they failed to disclose what types of loans were included in those categories.  The definition of "prime" loans in Defendants' 2005, 2006, and 2007 Forms 10-K was: "Prime Mortgage Loans include conventional mortgage loans, loans insured by the Federal Housing Administration ("*FHA*") and loans guaranteed by the Veterans Administration ("*VA*").  A significant portion of the conventional loans we produce qualify for inclusion in guaranteed mortgage securities backed by Fannie Mae or Freddie Mac ("conforming loans").  Some of the conventional loans we produce either have an original loan amount in excess of the Fannie Mae and Freddie Mac loan limit for single-family loans ($417,000 for 2006) or otherwise do not meet Fannie Mae or Freddie Mac guidelines.  Loans that do not meet Fannie Mae or Freddie Mac guidelines are referred to as "nonconforming loans".

230.     Nothing in that definition informed Plaintiffs that Defendants included in its prime category loans with FICO scores below 620.  Nor did the definition inform Plaintiffs that

the "prime non-conforming" category included loan products with increasing amounts of credit risk, such as (1) reduced and/or no documentation loans; (2) stated income loans; or (3) loans with loan to value or combined loan to value ratios of 95% and higher. Finally, it did not disclose that Defendants' riskiest loan product, the Pay-Option ARM, was classified as a "prime loan".

231. The foregoing misrepresentations were made with the intention that Plaintiffs rely thereon. It was important to Defendants that Plaintiffs rely on its misrepresentations so that Plaintiffs would come to a false understanding as to the nature of Defendants' business. The foregoing misrepresentations were specifically intended to convince Plaintiffs to take mortgages form Defendants.

232. The campaign of misinformation succeeded. Plaintiffs relied upon the misrepresentations and entered into mortgages with Defendants.

233. By reason of Defendants' prominence and campaign of deception as to its business plans and the relationship of trust developed between each of the Defendants and Plaintiffs, Plaintiffs were justified in relying upon Defendants' representations.

234. As a result of relying upon the foregoing misrepresentations, each Plaintiff entered into a mortgage contract with Defendants.

235. In fact, the appraisals were inflated. Defendants did not utilize quality underwriting processes. Defendants' financial condition was not sound, but was a house of cards ready to collapse, as Defendants well knew, but Plaintiffs did not. Further, Plaintiffs' mortgages were not refinanced with fixed rate mortgages and neither Agate nor Defendants ever intended that they would be.

236.     As a result of Defendants' scheme described herein, Plaintiffs could not afford the Defendants mortgage when its variable rates features and/or balloon payments kicked in. Further, as a result of the Defendants scheme, Plaintiffs could not refinance or sell their residence without suffering a loss of their equity investments.

237.     As a result of the foregoing, Plaintiffs have lost all or a substantial portion of the equity invested in their houses and suffered reduced credit ratings and increased borrowing costs, among other damages described herein.

238.     Plaintiffs' reliance on the misrepresentations of the Defendants, appraisers and Agate, all directed and ratified by the Defendants, was substantial factor in causing Plaintiffs' harm.

239.     Defendants and the Defendants represented to multiple Plaintiffs that they would be assisted by Defendants in a loan modification. As described herein, that representation was false. Defendants knew that representation was false when they made it.

240.     Because of new laws pertaining to loan modifications and Defendants' insistence that they had a genuine interest in complying therewith and in keeping borrowers in their homes, Plaintiffs reasonably relied on the representations.

241.     By delaying Plaintiffs from pursuing their rights and by increasing Plaintiffs' costs and the continuing erosion of each Plaintiff's credit rating, each Plaintiff's reliance harmed that Plaintiff.

242.     Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from the matters complained of in this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and

services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

243.   Plaintiff's reliance on the representations made by Defendants and Defendants was a substantial factor in causing Plaintiff's harm.

244.   Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

### THIRD CAUSE OF ACTION
**(By All Plaintiffs – Negligent Misrepresentation – Against All Bank Defendants)**

245.   Paragraphs 1 through 245 are hereby incorporated by reference as though fully set forth herein.

246.   Although the Defendants may have reasonably believed some or all of the representations they made, described in this Complaint, were true, none of them had reasonable grounds for believing such representations to be true at the time: (a) the representations were instructed to be made, as to those Defendants instructing others to make representations, or (b) at the time the representations were made, as to those Defendants making representations and those Defendants instructing others to make the representations, or (c) at the time the representations were otherwise ratified by the Defendants.

247.   Such representations, fully set forth in the First Cause of Action and previous sections of this Complaint, were not true.

248.   Defendants intended that Plaintiffs rely upon those misrepresentations.

249.   As described herein, Plaintiffs reasonably relied on those representations.

250.     By reason of Defendants' prominence and campaign of deception as to its business plans and the relationship of trust developed between each of the Defendants and Plaintiffs, Plaintiffs were justified in relying upon Defendant' representation.

251.     As a result of relying upon the foregoing misrepresentations, each Plaintiff entered into a mortgage contract with a Defendants.

252.     As a result of Defendants' scheme described herein, Plaintiffs could not afford his or her Defendants mortgage when its variable rate features and/or balloon payments kicked in.  Further, as a result of the Defendants scheme, Plaintiffs could not refinance or sell his or her residence without suffering a loss of Plaintiff's equity.

253.     Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages as a result of the foregoing also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

254.     Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## FOURTH CAUSE OF ACTION
### (By all Plaintiffs – Invasion of Constitutional Right to Privacy – Against All Bank Defendants)

255.     Paragraphs 1 through 254 are hereby incorporated by reference as though fully set forth herein.

256.    The guarantee of privacy granted to each Californian is a special and unique right embedded in the very first clause of the California Constitution.   Article I, § 1 of the California Constitution provides:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and **privacy**.
> (Emphasis supplied)

257.    The unauthorized disclosure of "*Private Information*" (confidential, nonpublic personal information, including such information as social security numbers, dates of birth, property values, bank and credit card account numbers, and other personal information) is a fundamental violation of Californians' <u>inalienable</u> right to privacy.   Each Plaintiff has a constitutionally protected privacy interest and right in his or her Private Information.

258.    Each Plaintiff provided Private Information to the Defendants as a requirement for obtaining a mortgage from Defendants.  Each Plaintiff had a reasonable expectation that the Defendants would preserve the privacy of that Plaintiff's Private Information.   The right of privacy and the Plaintiffs' interest in their Private Information is a constitutionally protected inalienable property right.

259.    Defendants directly and through their agents violated Plaintiffs' inalienable privacy rights by disclosing the Private Information without their knowledge, authorization or consent.  This unauthorized disclosure of private information is intrusive into the most private reaches of the Plaintiffs' lives, and does not include information that is of a legitimate public concern.

260.     Possession of personal confidential information allows criminals to "breed" identities, that is, to obtain other forms of identification that may further enhance their ability to misuse another's identity.

261.     Social security numbers are among the most sought after and valuable items of personal information to an identify thief.

262.     The average victim of unauthorized use of wrongfully disclosed personal confidential information spends approximately 600 hours and $1,400 repairing his or her credit once violated.

263.     Victims of identity theft also often suffer further financial loss from the denial of credit or utility services, increased difficulty in securing employment and housing, and higher insurance and credit rates.  In some cases, an identity theft victim may even have a criminal record develop in his or her name.  Further costs include lost wages or vacation time, diminished work performance, increased medical problems, and impact on family and friends.

264.     It is often the case that a victim will not discover that his or her Private Information has been stolen and misused until long after an identity theft has taken place, and then only when they are denied credit or discover that their bank account has been emptied.

265.     The California Constitution (Art. I, § 1) is self-executing and confers a right of action beyond the scope of the mere common law tort.  *See, e.g., Burt v. Orange* (2004) 120 Cal.App.4th 273, 284.

266.     Fundamental to privacy is the ability to control circulation of personal information.  The proliferation of business records over which individuals have no control limits their ability to control their personal lives.  Personal privacy is threatened by the information-gathering capabilities and activities of private business – and never more than when a financial

institution that requires personal information to permit a consumer to buy a home and obtains it with the assertion and promise it will be safeguarded fails to safeguard that information.

267. On information and belief, as Defendants' condition deteriorated, in furtherance of Defendants' unlawful deception of Plaintiffs and Defendants' investors, Defendants began running credit checks on its borrowers to determine who was experiencing financial difficulties. These credit checks were outsourced, meaning that private data and other information was sent off-site. The goal was to develop information that could be used to further Defendant's fraud involving the sale of collateralized securities and also to improperly provide information to those who already had purchased such collateralized securities in order to give Defendants a tactical advantage ahead of other banks.

268. But, the real estate market collapsed so rapidly that Defendants was caught in the middle of its scheme. The FBI then identified Defendants employees for their role in the unlawful disclosure of private and confidential information.

269. On information and belief, third parties unlawfully used the Private Information acquired from Defendants thereby further damaging each Plaintiff.

270. By reason of the conduct alleged herein, Defendants violated each Plaintiff's constitutional right of privacy and each Plaintiff has suffered special damages in an amount according to proof at trial.

271. Further, as a proximate and foreseeable result of Defendants' intentional disclosure of Plaintiff's Private Information, each Plaintiff has suffered general damages – including pain and suffering and emotional distress – in an amount according to proof at trial.

272. Defendants conduct is willful, outrageous and pervasive, involving hundreds of thousands of California citizens. Not only did Defendants abuse Private Information, willfully

72

COMPLAINT

EXHIBIT 1   -85-

fail to maintain the security of the Private Information, and then disclose it to third parties without permission, but they took no material steps to retrieve the Private Information, concealed the extent of the violations, and then embarked on a scheme to defraud this Court and the United States District Court for the Western District of Kentucky.

273.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages as a result of the foregoing also include direct losses associated with identify theft and the losses associated with reduced credit scores, including, among others, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

274.    Defendants acted with actual malice by disclosing Plaintiffs' Private Information, failing to cure the same, concealing the magnitude of the problem, and then lying to this Court and the Kentucky Federal Court, and retailing against California Plaintiffs herein by covertly attempting to maneuver this Court into depriving them of their rights.  Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## FIFTH CAUSE OF ACTION
**(By All Plaintiffs – Violation of California Financial Information Privacy Act – Against All Bank Defendants)**

275.    Paragraphs 1 through 274 are incorporated by reference as though fully set forth herein.

276.     The Defendants' disclosure of nonpublic personal information and personally identifiable financial information constituted violations of the California Financial Information Privacy Act. California Financial Code §§ 4050-4060.

277.     Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages as a result of the foregoing also include direct losses associated with identify theft and the losses associated with reduced credit scores, including, among others, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

278.     The Plaintiffs may recover damages under California Financial Code § 4057(a) according to proof and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## SIXTH CAUSE OF ACTION
### (Injunctive Relief for Violation of Cal. Civil Code § 2923.5 – By All Plaintiffs Against All Bank Defendants)

279.     Paragraphs 1 through 278 are incorporated by reference as though fully set forth herein.

280.     Pursuant to California Civil Code, § 292.5, the Defendants – and each of them - are prohibited by statue from recording a Notice of Default against the primary residential property of any California without first making contact with that person as required under § 2923.5 and then interacting with that person in the manner set forth in detail under § 2923.5. An exception to this rule of law exists in the event the Defendants are unable with due diligence to contact the property owner.

74

COMPLAINT

EXHIBIT 1   -87-

281.     With respect to all Plaintiffs in this cause of action, the realty that is the subject hereof was and is their primary residential dwelling within the meaning of § 2923.5.

282.     The Defendants, and each of them, caused Notices of Default to be recorded against the primary residential properties of the Plaintiffs named in this cause of action absent compliance with California Civil Code. § 2923.5. Included in the noncompliance, Defendants, and each of them, caused declarations to be recorded in the public records that were – each of them – false.  This act also violates § 2923.5 and other California laws precluding the filing of false statements.

283.     Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## SEVENTH CAUSE OF ACTION
**(By All Plaintiffs – Violation of Cal. Civil Code § 1798.82 – Against All Bank Defendants)**

284.     Paragraphs 1 through 283 are incorporated by reference as though fully set forth herein.

285.     The Defendants failed to timely disclose to Plaintiffs the disclosure of their personal information as required under California Civil Code § 1798.82.

286.     As a proximate result of the foregoing untimely disclosure by Defendants, the Plaintiffs were damaged as described in this Complaint.  Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages also include direct losses associated with identify theft and the losses associated with reduced credit scores, including, among others, unavailability of credit, increased costs of credit, reduced availability of goods and services tied

to credit ratings, increased costs of those services. as well as fees and costs, including, without limitation. attorneys' fees and costs.  Plaintiffs may recover damages under California Civil Code § 1798.84 according to proof and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

### EIGHTH CAUSE OF ACTION
**(By All Plaintiffs – Unfair Competition – Against All Bank Defendants)**

287.    Paragraphs 1 through 286 are incorporated by reference as though fully set forth herein.

288.    Defendants' actions in implementing and perpetrating their fraudulent scheme of inducing Plaintiffs to accept mortgages for which they were not qualified based on inflated property valuations and undisclosed disregard of their own underwriting standards and the sale of overpriced collateralized mortgage pools, all the while knowing that the plan would crash and burn, taking the Plaintiffs down and costing them the equity in their homes and other damages, violates numerous federal and state statutes and common law protections enacted for consumer protection. privacy, trade, disclosure, and fair trade and commerce.

289.    The Defendants perpetrated their fraudulent scheme of selling off overpriced loans by making willful and inaccurate credit disclosures regarding Defendants' borrowers, including Plaintiffs, to third parties.  This false credit disclosure was critical to the success of Defendants' continued sales of the massive pools of mortgage loans necessary to perpetuate the scheme.  The Defendants were aware that if the true credit profiles of the borrowers and the values of their real estate were accurately disclosed, the massive fraudulent scheme would end. As a result, the Defendants repeated, reinforced and embellished their false disclosures.

290.     The Defendants knew the borrowers' credit was inadequate to support continued loan payments, absent unsustainable inflation of property values.  These pervasive false credit disclosures to third parties (including purchasers of bundled mortgage pools created by the Defendants) constituted false credit reports in violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* and these pervasive false disclosures permitted the Defendants to continue their scheme and victimize the Plaintiffs.

291.     These pervasive false disclosures also caused the bubble to burst.  Once it became known that some of the information provided by Defendants was false, the market for the sale bundled loans dried up.  The Defendants began to issue foreclosure notices, property values began dropping, and then, under the weight of *deflation* in a market that requires *inflation*, the equity investments made by Plaintiffs and others in their homes was lost... and then Plaintiffs were lost in the greatest economic recession since the 1930s.

292.     As alleged by the SEC, this fraud also violated Federal law, including, without limitation, the antifraud provisions and insider provisions of the Securities Act of 1933 ("*Securities Act*") and the Securities Exchange Act of 1935 ("*Exchange Act*"), including, without limitation:

   a.  Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), by engaging conduct which acted as a fraud on the purchaser of securities based on collateralized mortgage pools;

   b.  Section 10(b) of the Securities Act and Rule 10b-5 thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. 240.10B-5, by making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading and/or

otherwise engaging in acts, practices, or courses of business which operated as a fraud or deceit upon purchasers of securities based on collateralized mortgage pools; and

    c.   Section 13(a) of the Securities Exchange Act and Rules 12b-20, 13a-1 and 13a-3 thereunder, 15 U.S.C. § 78t(e) by filing with the SEC false information for the fiscal years 2005 through 2007.

293.    The foregoing violations were in furtherance of the fraud perpetrated on Plaintiffs. In fact, Defendants could not have told the truth in their public filings without that truth becoming known to Plaintiffs. Conversely, the false filings gave additional credence and support to omissions, concealment, promises and inducements.

294.    While processing the home loans of each Plaintiff herein, the Defendants and other Defendants came into possession, custody and control of their Private Information.

295.    The guarantee of privacy granted to each California is a special personal and property right. Other states may accord privacy rights by way of statute, or otherwise, but the privacy right in California is a unique, fundamental, Constitutional, and *inalienable* right that is also a protectable property interest. The privacy right granted by the California Constitution necessarily includes protection from the release of the Private Information.

296.    The Defendants acknowledge and admit that their agents and/or employees disclosed the Private Information of Plaintiffs to outside persons.

297.    This Private Information of Plaintiffs was sold or otherwise disclosed to third parties without Plaintiffs' consent, further violating Article I, § 1 of the California Constitution and the California Financial Information Privacy Act.

298.    The Private Information was disclosed and then used unlawfully and fraudulently to apply for and receive multiple credit cards, charge accounts, and other credit from businesses in the mistaken belief that they were dealing with a Plaintiff, and not with an identify thief.

299.    These undeniable disclosures by the Defendants of nonpublic personal information of the Plaintiffs and others also violated the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.*

300.    By violating Plaintiffs' right to privacy and by misappropriating nonpublic personal information for their own use, the Defendants thus wrongfully took each Plaintiff's property interest in his or her Private Information and privacy, injuring each Plaintiff, and, as a result, Plaintiffs are eligible for restitution because the Defendants wrongfully acquired the property in which Plaintiffs had an ownership or vested interest.

301.    The forgoing fraudulent concealment, material misstatements, and the intentional violations of state and federal statues cited herein constitute unlawful, unfair and fraudulent business acts or practices and so constitute unfair business practices within the meaning of the California Unfair Practices Act. Cal. Bus. & Professions Code §§ 17200, 17500. Sections 17200 *et seq.* of the California Business & Professions Code provide, in the disjunctive, for liability in the event of any such "unlawful, unfair or fraudulent business act or practice".

302.    The violations described herein are unlawful, in that they violate *inter alia* Article I, § 1 of the California Constitution, the California Financial Information Privacy Act, Cal. Civil Code §§ 1780.80-84, the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act and the Federal laws described herein.  These violations are the basis for liability under § 17200 of the Business and Professions Code, as is the unlawful and fraudulent activity described herein.

79

COMPLAINT

EXHIBIT 1   -92-

303.    The actions described herein are unfair and patently fraudulent in that they were conducted for the sole purpose of perpetuating an unlawful and unsustainable investment scheme.

304.    As a result of the actions, concealment and deceit described herein, each of the Plaintiffs has suffered material financial injury in fact, including as described elsewhere in this Complaint, loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

305.    As a further result of the actions, concealment and deceit described herein, each of the Plaintiffs has lost money or property as a result of such unfair competition, including the loss of Plaintiffs' property interest in their Private Information as a result of the unconscionable invasion of privacy and misappropriation of nonpublic personal information.

306.    California Civil Code § 2923.5 requires that each mortgagee, trustee, beneficiary, or authorized agent may not file a notice of default pursuant to California Civil Code § 2924 until 30 days after initial contact is made as required therein, or 30 days after satisfying the due diligence requirements to contact the mortgage described therein.  Defendants violated the foregoing law by causing a notice of default to be filed against Plaintiffs without the mandatory notice.  Defendants did not diligently endeavor to contact the Plaintiffs as required by § 2923.5(g) and Defendants thereby also violated California Civil Code §§ 2923.5 and 2924.

307.    As a result of the foregoing unlawful conduct, Plaintiffs suffered further injury in fact by the filing of notices of default and as such the Plaintiffs suffered monetary and property loss.  Such injuries and loss included diminished credit scores with a concomitant

increase in borrowing costs and diminished access to credit, fees and costs, including, without limitation, attorneys' fees and costs with respect to wrongful notices of default and loss of some or all of the benefits appurtenant to the ownership and possession of real property.

308.    The foregoing unlawful activities were pervasive and violate Business and Professions Code § 17200 *et seq.*

309.    As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants, including, without limitation, the excessive fees paid at Defendants' direction as alleged by the FTC, and premiums received upon selling the mortgages at an inflated value.

310.    Plaintiffs are also entitled to the issuance of a temporary restraining order, a preliminary injunction, and a permanent injunction restraining and enjoining Defendants from any further concealment with respect to the sale of notes and mortgages, any further violation of § 2923.5, any further violation of Article I, § 1 of the California Constitution, the California Financial Information Privacy Act, Cal. Civil Code § 1798.82, the Fair Credit Reporting Act, and the Gramm-Leach-Bliley Act, and any further disclosure or use of the Private Information, other than as intended by the Plaintiffs.

311.    Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

COMPLAINT

EXHIBIT 1   -94-